D. P. THOMPSON, RESPONDENT, v. ANDREW WOOLF, APPELLANT.

SUIT TO QUIET TITLE—POSSESSION WHEN LANDS ARE WILD.—One owning wild lands which he holds by deed from one seised by deed, is in such possession as to enable him to bring a suit in equity to remove a cloud from the title, under section 500 of the code.

EVIDENCE—PEDIGREE—DECLARATIONS OF DECEASED PERSONS.—Declarations of deceased person or persons out of the state, who were or are relatives of a family, may be received as evidence of pedigree. But before such declarations can be admitted, the relationship of the declarant to the family must be proved by other evidence than his declarations.

APPEAL from Washington County.

The complaint alleges, in substance, that respondent is the owner of a certain tract of land, and "by virtue of his title" is in possession thereof. That appellant has a sheriff's deed to said lands, under a tax sale, and that such deed is void and constitutes a cloud on the respondent's title. To prove his title, the respondent offered what purported to be a deed from Green C. Caruthers and eighteen others in the state of Arkansas, dated August 8, 1869, and purporting to convey to B. Goldsmith the interests of the said nineteen grantors in "all the estate, both real, personal, and mixed,

of which Finice Caruthers, whose real name was Finice Thomas, lately deceased, in said county of Multnomah, died possessed." No specific interest is mentioned in said deed, and the lands in controversy herein are described as a part of that estate. Respondent then offered quitclaim deeds from B. Goldsmith to the South Portland Real Estate Association, and from S. P. R. E. A. to respondent, each purporting to convey the same lands as the Arkansas deed.

*T. B. Handley, and Thayer & Williams,* for appellant.

*B. Killen,* for respondent.

By the Court, BOISE, J.:

It is claimed by the appellant that the respondent has not shown such a possession of the land as to entitle him to maintain this suit under section 500 of the code. The possession claimed by respondent is constructive and results from deraigning his title by mesne conveyances from the heirs-at-law of Finice Caruthers, deceased. If his title is perfect, we think he would be in constructive possession without making an actual entry, for the heir becomes seised and presented without entry. (1 Washburn on Real Property, p. 48, sec. 81; *Brown* v. *Wood,* 17 Mass. 68.) And a deed from one in possession confers seisin on the grantee without entry, and such constructive possession has been held sufficient to support a suit in partition. (*Brownwell* v. *Brownwell,* 19 Wend. 369; *Beebee and wife* v. *Griffing,* 14 N. Y. 235.) And such possession has been held sufficient in this state in practice in the circuit courts, in cases of partition. And if constructive possession is sufficient to give the court jurisdiction in cases of partition, we do not see any reason why such possession should not suffice in suits under section 500. For the language conferring the jurisdiction is the same in both cases so far as requiring possession is concerned. We think, therefore, that the possession alleged is sufficient.

The appellant claims that the evidence produced by the respondent is not sufficient to show *prima facie* that the persons who claim to be heirs of Finice Caruthers, and from

whom respondent seeks to deraign title, are such heirs. All the evidence on this subject is contained in the deposition of A. C. Gibbs, who testified that he knew Finice Caruthers in his life-time quite intimately, about the fall of 1858, in Portland, Oregon, and was his attorney, and on being asked what was his true name, said, I suppose it was Finice E. Thomas. This answer was objected to, and was incompetent as being merely the opinion of the witness. He also says that he knew the mother of Finice; that he was not acquainted with her, but had seen her. Then, on being asked " what was her name," he answered, " Her name was Elizabeth Thomas, but she went by the name of Elizabeth Caruthers. She and Finice lived together near Portland, and recognized each other as mother and son." His testimony is then as follows:

" Q. 8. What blood relatives did Finice Caruthers have at the time of his death ? State fully their relation, names, and places of residence, and your means of knowledge concerning their relationship ?

"A. 8. He left relatives on his mother's side who were cousins; none nearer than cousins that I know of. Those whom I have seen and now remember, are Green C. Caruthers; Jackson Caruthers; Mary Ann Mauldin, subsequently married and known by another name; Louisa Caruthers, the wife of a man by the name of Newman, first name I don't remember; also the wife of a man by the name of Chilcoat, all of or near Circe, White county, Arkansas. I also knew John Caruthers, Allen Caruthers, and another man by the name of Caruthers whose first name I don't remember, a brother of the other two, who resided at Waverley, Illinois. I visited this family at Waverley, Illinois, and spent several days with them. I also visited the persons above named residing in White county, Arkansas, at two different times. One time I spent from one to two weeks with Green C. Caruthers. While in White county, I became acquainted with some fifteen or twenty members of the same family, and conversed with them often and freely with reference to their relationship to Finice Caruthers. At the time of some of these conversations, I had with me

the family circle or diagram now presented; I mean, not the same paper, but a copy of the same, which I now present and offer as a part of my answer. From statements made to me by these various persons, and particularly the older ones; and from correspondence that I had had with some of them and others of the family for some six or eight years, I gained the information as to their relationship to Finice Caruthers. I should add, by way of modification of the above, that a part of the family circle above referred to, was made up from information derived on those trips.

"Q. 9. Are any of the persons, whose names you have given above, now residing or in the state of Oregon?

"A. 9. None of the persons I have named, that I know of, reside in Oregon. There are one or two children of Samuel Caruthers, referred to in the diagram, who reside in Oregon.

"Q. 10. How do these cousins of whom you have spoken trace their relationship to Finice Thomas, commonly called Finice Caruthers?

"A. 10. The head of the family were John and Polly Caruthers of Charlotte, Dixon county, Tennessee; Elizabeth Thomas, called Elizabeth Caruthers, was a daughter of John and Polly. The other persons I have referred to are children and descendants from the brothers and sisters of Elizabeth Caruthers.

"Q. 11. When did these aunts and uncles of Finice die?

"A. 11. I can't state; I have information on memorandums and in letters, but I can't state it from memory. A part of it is entered on the diagram.

"Q. 12. Did they die before or after the death of Finice Caruthers?

"A. 12. I think they all died before Finice died; I think Elizabeth outlived all her brothers and sisters.

"Q. 13. Did you have any acquaintance with Alexander B. Caruthers?

"A. 13. No, only from letters; I never saw him. I corresponded with him.

"Q. 14. What was Finice Thomas' father's name?

"A. 14. I suppose it was Joseph Thomas.

"Q. 15. Were you a subscribing witness to the deed marked 'B,' which I now hand you?

"A. 15. I was.

"Q. 16. Did you see the grantors named in that deed execute it, sign, and seal it?

"A. 16. I did, all of them; and I might add, I paid the money.

"Q. 17. What relation to Finice Caruthers were the respective grantors in said deed, Exhibit 'B'?

"A. 17. The following named persons, who executed said deed, are: first cousin, Green C. Caruthers; the others are children of first cousins of Finice."

On cross-examination:

"Question 1. How, if at all, were you interested in the estate of Finice Caruthers while on your visit to Illinois and Arkansas, spoken of by you in your direct testimony?

"Answer 1. I had an interest under a contract with Jeff. Carter and D. B. Hannah in a part of the property purchased before the time I went east as above referred to, and a half interest in all that was purchased by me for B. Goldsmith.

"Q. 2. Did you make the diagram, or furnish the facts on which it was made?

"A. 2. It was commenced (the original diagram) by Chas. W. Parrish and myself from information derived through D. B. Hannah, who had been east; and from affidavits and letters to which I have referred above. That diagram was taken east by me on the trips I referred to, and was extended and added to, as I got farther information concerning the family.

"Q. 3. How much of it was made before you went east, and how much afterward?

"A. 3. All of the first, or inner circle, was made before I went; and all of the second circle from the center, excepting, perhaps, a few dates therein; and, as near as I now recollect, from a third to a half of the third circle.

"Q. 4. Had you any other information from which to form that diagram, and on which to base the testimony you have just given, than the statement of the persons whose claims you were buying?

" A. 4. I had their statements and some affidavits and letters that I have referred to in my direct examination; in addition, I had the statement of D. B. Hannah that he had visited other members of the same family.

" Q. 5. Do you base your supposition as to the name of Finice Caruthers, or Thomas, and of his father, upon the same grounds you have given in your last answer ?

" A. 5. Only in part. I was acquainted with Finice Caruthers; I learned his name from what he said. In the land office, Elizabeth Caruthers made affidavit with reference to her name and where she was born.

" Q. 6. Did Finice Caruthers ever tell you that his name was Thomas ?

" A. 6. He did not, that I recollect of.

" Q. 7. Did he ever inform you of any of the relationships you have testified to in this examination ?

" A. 7. No, excepting as I heard him speak of his mother.

" Q. 8. With how many of the signers of this deed, Exhibit B, did you converse regarding their relationship to Finice Caruthers, deceased ?

" A. 8. On Saturday and Sunday preceding the date of the deed, there was a two-days meeting held near Circe. On Saturday, after the meeting, I met all the persons named in that deed, made explanations in connection with what I had said to some of them before; and I think, on the Monday following, the deed was executed. If I did not talk with all personally, I talked with them all within my hearing.

" Q. 9. With how many of those persons had you talked previously ?

" A. 9. With Green C. Caruthers, Jackson Caruthers, Mr. Newman and his wife, and the wives of Green C. and Jackson, and with Louisa Caruthers, William Chilcoat and his wife, Elizabeth Adcock.

"Q. 10. To whom did you pay the consideration of that deed ?

" A. 10. I paid four hundred dollars of it to Green C. Caruthers; part of it to Louisa Caruthers; the balance was handed to Geo. W. Newman and Jackson Caruthers, for

them to divide among the others, as it was not convenient to make change from the size of the bills I had. It was paid in the presence of all.

"Q. 11. What was the estimated value of the property conveyed by that deed?

"A. 11. I can't now state, as I don't remember their fractional interests; their fractional interests were not alike. It would take considerable time to make a calculation of it. I suppose the value of all the property referred to, and mentioned in the deed, was at the time $100,000 and more.

"Q. 12. State as near as you can the proportionate share of the aggregate interest of the signers of that deed in the entire estate of Finice Caruthers, deceased?

"A. 12. It might have been one twentieth, perhaps, of the estate; this is a rough calculation."

On redirect examination:

Question 1. What did Green C. Caruthers tell you about the family history? State it all, as near as you can.

"Answer 1. I first met Green C. at Sulphur Springs, Arkansas, in company with Jackson Caruthers and the families of both. I spent two days with them there; during that time we talked a great deal about the family. I don't remember near all he said, but I remember that he said, in substance, that he had been acquainted with Elizabeth Thomas and Finice; that he knew them in Washington county, Arkansas; that she said, and it was reputed by the family, that she came there from Dixon county, Tennessee; and that she was married to a man by the name of Thomas, whom he had never seen, and who had never been heard from by her or any of the family since she left Tennessee. He said that during the war, the fore part of the war, he was a Union man, and it wasn't safe for him to stay in that country; that he went north; that he had corresponded with this branch of the family in Waverley, Ill.; and that he went up to his relatives there and stayed with them during the most dangerous period of the war; that while there, he talked over the relationship of the family; that some of the relations at Waverley he had never seen before. He said that Samuel Caruthers and William Car-

uthers, of Texas, and Alexander B. Caruthers, of Arkansas, were own cousins of his; that they were in sympathy with the other side; that he corresponded with them while he was north; and that since he heard of the death of Finice, and his leaving an estate in Oregon, he had taken more pains to trace and find out the relationship, and find how many were entitled to share in the estate. I then showed him the family circle before referred to, as far as it was then made up, in the presence of Jackson Caruthers and their families. He said it was correct; he added, however, that there were some members of the family in Tennessee that he did not know of until I showed him the family tree; but that he was personally acquainted with Elizabeth Caruthers, and knew, or knew of, all of her brothers and sisters. Those that he had lost the run of, were children of his cousins; he (Green C.) is a man of about sixty-eight years old."

From this testimony it appears that the witness did not derive this knowlege of the relationship of the persons of whom he speaks as relatives of Finice from any declarations made by Finice or his mother. He says on the subject of their declarations: "I was acquainted with Finice Caruthers. I learned his name from what he said. In the land office Elizabeth Caruthers made affidavit with reference to her name and where she was born." The governor then says that Finice never told him his name was Thomas, or spoke of any relatives except his mother. He does not state the contents of the mother's affidavit, as to what her name was, or where she was born; nor would such evidence been competent, for the affidavit was the best evidence of the declarations on these subjects. So there is no evidence of any declarations, coming from Finice or his mother, tending to show that their names were Thomas, or from what country they came, or where they were born, or who were their kindred. Nor is there any evidence in the case tending to show that they came from Arkansas, except that they bore the names of Elizabeth and Finice Caruthers. The only evidence tending to prove their identity with the Finice and Elizabeth Thomas, who are spoken of by Green C. Ca-

ruthers, is that persons of that name, who were reputed as relatives, came to Arkansas from Dixon county, Tennessee. But the declarant, Green C., does not state that they left Arkansas for Oregon, or where they went. If he had stated that in a certain year, or about such a time, they had left for Oregon or the Pacific coast, or that he had heard of them or corresponded with them, it might be some evidence of identity. Or if the respondent had produced an affidavit of Elizabeth Caruthers from the land office, declaring that her true name was Thomas, or that she had been born in Tennessee, or had relatives there or in Arkansas, this, then, would have been evidence tending to show that Finice Caruthers was the same person of whom Green C. Caruthers speaks.

The declarations made to Governor Gibbs might be evidence to show that the parties who executed the deed were the kindred of the Finice and Elizabeth Thomas who came to Arkansas and who were entitled to a place in the family circle. But they could have no tendency to prove their identity with Finice and Elizabeth Caruthers, who died in Oregon, for the declarations were not in any way descriptive of the persons, except so far as the names are identical. We think this evidence is insufficient to show that the parties who signed the deed were the heirs of Finice Caruthers. Respondent claims that the evidence in this case is as full and conclusive as in the case of *Jackson* v. *Cooley*, 8 Johns. 127. In that case the witness testified that he was acquainted with William Wilson, the ancestor, when he resided in New York. That he removed from this country to England prior to the year 1783. That he was his agent, after he left, for managing the land in controversy. That he understood that he died, leaving no children, brother, or sister, and that John Wilson was his only nephew and heir-at-law. That after the death of William Wilson, John Wilson represented himself as heir, and witness was his agent in relation to the lands in question, and that he always understood, from the acquaintances of the family and people who claimed an interest in the lands, that John Wilson was both devisee and heir. Witness in that case also stated that his in-

formation was derived from the several powers of attorney he received, and correspondence with the parties, and conversations with Banjer Corp, and other acquaintances of the family. The question in that case seems not to have been one of identity, but rather who of the Wilson family survived. In that case the witness testified of the declarations of those who knew the family, both the ancestor and the one who claimed as heir. In this case there are no declarants referred to who pretend in their declarations to have known Finice Caruthers in Oregon, or that he was the same person who, many years before, had been in Arkansas. The cases are not parallel.

Declarations of a deceased person or persons out of the state, who are related to a family, may be admitted to prove pedigree. But before such declarations can be admitted, the relationship of the declarant to the family must be proved by other evidence than his declarations. (Wharton's Evidence, c. 4, sec. 218.) And there is no other evidence adduced in this case to show that Green C. Caruthers was a relation of Finice Caruthers than as above stated. Governor Gibbs in his testimony speaks of deriving a part of his information as to this relationship from D. B. Hannah. But Hannah was not a relative or acquaintance of the Caruthers family, except as he had been in Arkansas and elsewhere to hunt them up, and gather evidence of such relationship. If he had found such evidence, it should have been produced, for an agent can not go forth to hunt an heir to a large estate, and when he has found the supposed heir, and evidence enough to convince them of the genuineness of the relationship, come before a court and on his oral testimony, without producing the evidence which has convinced him, establish the pedigree. The whole testimony in this case amounts to simply this; that Governor Gibbs, in his correspondence, travels, and searches, has found enough evidence to convince him that these persons who signed the deed are the relatives of Finice Caruthers. But his opinion on this subject is not sufficient. The opinion of the witness is not evidence; we must go behind

the opinion and look at the facts and judge for ourselves of their weight.

We think, therefore, that there is not sufficient evidence to support the respondent's title in this suit; that it is not proved that the persons who signed this deed are the heirs of Finice Caruthers, who was the owner of the land in question at the time of his death.