FLORA v. ANDERSON et al.

(Circuit Court, S. D. Ohio, W. D.  June 26, 1896.)

No. 4,770.

1. EVIDENCE—DECLARATIONS—PEDIGREE.
  The rule permitting a resort to hearsay evidence in cases of pedigree extends only to the admission of declarations by deceased persons who were related by blood or marriage to the person in question, and not to declarations by servants, friends, or neighbors.

2. SAME—ILLEGITIMATE RELATIONSHIP.
  The rule is also limited to cases of legitimate relationship, and such evidence cannot be introduced to establish an unlawful relationship, per se, where a lawful relationship is not claimed.

3. SAME—ILLEGITIMATE ISSUE.
  Upon consideration of the evidence offered upon the question whether complainant was the illegitimate son of one E., *held*, that it was fully shown that he was not.

4. WILLS—ISSUE—OHIO STATUTE OF DESCENTS.
  The provision in the Ohio statute of descents of 1853, permitting bastards to inherit or transmit inheritance on the part of their mothers, does not enable an illegitimate child of a woman to take under a devise of a remainder to the issue of the body of such woman. Flora v. Anderson, 67 Fed. 182, reaffirmed.

John W. Menzies, E. W. Hawkins, L. H. Swormstedt, and Foraker & Prior, for complainant.

Wm. Worthington and Thos. McDougall, for respondents.

SAGE, District Judge.  The complainant sues to recover two-twelfths of the estate of Nicholas Longworth, claiming as the illegitimate son of Eliza Longworth Flagg, under the will of Nicholas Longworth, her father, executed on the 25th of March, 1859, and under the codicil thereto, executed the 15th of January, 1862, whereby he devised to Larz Anderson, his son-in-law, and to Joseph Longworth, his son, who were named as executors, two-twelfths of his estate, in trust for the benefit of his daughter, Eliza Longworth Flagg, during her life, with remainder to "the issue of her body surviving her," and in default of such issue to his son, Joseph Longworth, and his grandson, John L. Stettinius.  Nicholas Longworth died on the 17th of February, 1863.  Eliza Longworth Flagg died December 13, 1891, without issue of her marriage.  To maintain his claim, the complainant must establish:  First, that he is the illegitimate son of Eliza L. Flagg; and, second, that if so, he is entitled under the will to the remainder devised to "the issue of her body surviving her."

The testimony—that for the complainant covering 787 printed pages, and that for the defendants 875 typewritten pages of legal cap, besides numerous exhibits on each side—is too voluminous for detailed comment.  That, however, is not necessary to the proper consideration of the case.  The testimony offered on behalf of the complainant is founded almost altogether upon rumor and hearsay.  Of the total number of 58 witnesses examined on his behalf only 5 testified to statements alleged to have been made to them by members of the Longworth family.  Later in this opinion the testimony

of these five will be, so far as may be necessary, specially considered. The story which the witnesses tell is, in short, that early in July, not earlier than 1823 nor later than 1825, the complainant, then an infant a few days old, was, in pursuance of an arrangement previously made, delivered by agents of Nicholas Longworth and of Eliza, his daughter, to James Flora and wife, to be raised. The preliminary arrangements were made by a man who represented himself to be Nicholas Longworth's gardener. The child was taken from Cincinnati, and delivered to Mr. and Mrs. Flora for safe-keeping, by Davis Carneal, who was the husband of a half-sister of the mother of Eliza Longworth, and who, it is testified, stated, without any attempt at concealment, that the child was the son of Eliza Longworth. The story is, further, that money and clothes were furnished, through the gardener by the family of Nicholas Longworth, and that the child, when six months old, was visited by him. All this, excepting only what relates to the statement of Davis Carneal, is upon hearsay, from persons not belonging or in any way related to the Longworth family, the witnesses detailing statements which they claim were made to them or in their hearing, in some cases 30 years, in others 50 years or more, before the evidence was given. It is further claimed, on like testimony, that when complainant was between 10 and 12 years of age, Nicholas Longworth on two occasions recognized him as "the boy that was taken over to Flora's," and that in 1863 he was recognized by Larz Anderson as "a member of the Longworth family." Reliance is also placed upon alleged declarations by Nicholas Longworth in the spring of 1845 and in December of that year to a certain Mrs. Dick that the complainant was the son of his daughter, Eliza Longworth; also upon Mrs. Dick's testimony to certain alleged admissions to her by Eliza Longworth to the same effect. These will be further considered in the discussion of her testimony.

The defendants, not admitting the competency of any of the evidence relating to the taking of the complainant to Kentucky and committing him to the care of James W. Flora and wife, call attention to the discrepancy between the alleged statements of the man who represented himself to be the gardener of Nicholas Longworth, and who said that the infant was the child of a woman who was dead, and the alleged statement of Davis Carneal, who said that the child was Eliza Longworth's, and that "it was a smuggled piece of business"; also to the extreme improbability that Carneal would go over to Kentucky publicly proclaiming the very fact to conceal which the child was sent away, and, which known, would ruin the reputation and wreck the life of Eliza Longworth, and bring shame and disgrace upon all immediately related to her, including himself, he being her uncle; a fact moreover which it was not at all necessary to disclose. In this connection the rule stated in section 200 of Greenleaf on Evidence that verbal admissions ought to be received with great caution, because the evidence, being a mere repetition or stating the substance of oral statements, is subject to much imperfection and mistake, the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him, is peculiarly applicable. "It frequently hap-

pens, also," says Mr. Greenleaf, "that the witness, by unintention-
ally altering a few of the expressions really used, gives an effect to
the statement clearly at variance with what the party actually did
say." John Thatcher, the only witness who claims to have heard
Davis Carneal make any statement relative to the taking of the
complainant, when but a few days old, to Kentucky, undertook to
detail statements made in his hearing, when he was a boy of 14, more
than 70 years before he gave his deposition.

With reference to the alleged first recognition of the complainant
by Nicholas Longworth, the evidence is to be found in the testimony
of the complainant himself, who does not pretend that Mr. Long-
worth recognized him as his grandson or relative. His testimony is
that when a boy he came to the city with a boat load of wood, and
Mr. Carneal came to the boat, and took him up town to "see a man
and see the town." They met on the street an old gentleman, whom
Mr. Carneal accosted as Mr. Longworth, and introduced complain-
ant as the boy that was taken from Cincinnati to be raised by James
Flora and Sarah, his wife. He says that Mr. Longworth, taking him
by the hand, asked him if he went to school, and if he was well sat-
isfied, and was well treated; that he answered all these questions in
the affirmative; and then Mr. Longworth patted him on the shoulder,
and said, "You be a good boy, and you will be well recompensed
hereafter." Then Mr. Carneal and he went one way and Mr. Long-
worth another. About two years after that he came to the city with
another boat load of wood, and Mr. Colbert, the owner of the boat,
went up Pike street with him. As they were passing in front of
Mr. Longworth's residence, that gentleman was coming from his
house to the street. He looked at complainant, and asked Colbert
if that was John who was with Carneal. Complainant said he was.
Then Colbert left him, and walked on. Mr. Longworth shook hands
with him, invited him into his house. He went into the lot, but did
not go to the house. Mr. Longworth took him into his wine house,
which was separate from the dwelling house, and showed him his
"wine garden," as he called it. After looking through that, they
walked back to the street, where they parted, Mr. Longworth invit-
ing him to come again. After that he met Mr. Longworth several
times on the street, but never saw him after 1843, the date of com-
plainant's marriage.

He further testifies that in 1851 or 1852, at Newport, Ky., he
met and was introduced to Mr. Larz Anderson by Mr. Richard Tar-
vin Baker, who presented him as the boy who was taken from
Cincinnati to Flora and wife, saying, "I want to introduce you to
one of your relations," and that Mr. Anderson responded, "Yes,
he is a member of the Longworth family." His next meeting with
Mr. Anderson was in October or November, 1863, at his own house.
He prefaces the account of that meeting by stating that a Mrs.
Kautz recommended him and his wife to go there; that she came
to his house in May or June, 1863, from New Richmond, he never
having heard of her before that time, and said that she was sent
there by Eliza Flagg, to see him; that he was a grandson of Nich-
olas Longworth, and that Eliza Flagg, whose maiden name was

Eliza Longworth, was his mother; that Mrs. Flagg had told her so with her own mouth, and wanted him to come and see her. That was in May or June, 1863. In September of the same year she returned, and remained some two weeks. At that time she told the complainant that Mrs. Flagg had sent her again with four photographs; one of Mr. Longworth, one of his wife, one of herself, and one of Mr. Larz Anderson. These photographs were identified, and offered in evidence. At that time also she said that Mrs. Flagg wanted complainant to go and see her. In October or November of 1863 he testifies that his wife and himself came to Cincinnati to see Mrs. Kautz at her house in the vicinity of where the Union Central Railroad passenger station now is, and that Mrs. Kautz told them that Mrs. Flagg had gone to New York, and advised them to go and see Mr. Larz Anderson. Accordingly they went to Anderson's house, at the corner of Pike and Third streets. They met Mr. Anderson and his wife on the steps, and told them that Mrs. Kautz had directed them there for information, complainant stating to Mr. A. that he had always been told that Eliza Flagg or Eliza Longworth was his mother and Davis Carneal his father. Mr. Anderson made no reply. He then reminded Mr. Anderson of their meeting in Newport, and of Mr. Anderson's saying that complainant belonged to the Longworth family, to which Mr. A. assented. Meantime complainant's wife was pressing the same line of inquiry upon Mrs. Anderson. They were invited into the house, and declined. The invitation was repeated, and insisted upon. Finally they went into the house, remained an hour or more, were introduced to Joseph Longworth, and took tea or lunch with him and with Mr. and Mrs. Anderson.

The testimony as to the first recognition by Mr. Longworth does not need any special mention. It indicates no acknowledgment of any relationship whatever. The story of the meeting of Mr. Larz Anderson in Newport, Ky., in 1851 or 1852, and of his declaration that complainant was a member of the Longworth family, is highly improbable. As to the visit of Mrs. Kautz, the defendants establish to the entire satisfaction of the court that she was entirely unknown to the Longworth family, although she claimed to have been employed by Mrs. Flagg; and that, while the photographs of Mr. and Mrs. Longworth—which she, according to complainant's testimony, gave to him as having been sent by Mrs. Flagg—are genuine, the pretended photograph of Larz Anderson is spurious, as is testified by seven old and well-known citizens of Cincinnati, who were personally acquainted with Mr. Anderson, and by four members of the Longworth family. The defendants present two or three genuine photographs of Larz Anderson. Even a casual comparison of them with the photograph said to have been given complainant by Mrs. Kautz is sufficient to show that that is not a photograph of Mr. Anderson. It differs in the face, in the form, and in the general appearance. The photograph which purports to be a photograph of Eliza Longworth is proven to be in fact the photograph of a Mrs. Seebohm, formerly of Cincinnati, but for many years, and until her death, in 1883, a resident of Day-

ton, Ohio. Her husband was a photographer and portrait painter. That the photograph is hers is conclusively established by the testimony of her nieces, Susan Krucker and Eliza Neiman, and of her daughters, Bertha Mencke and Ida A. Eytinge.

As to the second interview with Mr. Longworth to which the defendant testifies, if the testimony be conceded to be true, it amounts to nothing in support of the complainant's case. In answer to the testimony that Mr. Longworth showed him through his wine house, the defendants present ample proof that there never was a wine house at or near the place nor within the inclosure located by complainant. The contradiction of the complainant's testimony in this respect is complete.

Every person who could furnish any testimony as to the alleged visit to Mr. and Mrs. Larz Anderson, whether it took place, and, if so, what actually occurred, is dead. The complainant and his wife are secure from direct contradiction. But it is incredible that when they announced the purpose of their visit, coupling with that announcement the statement that they understood that complainant was the offspring of an incestuous amour between Eliza Flagg in her young girlhood and her uncle, Davis Carneal, they were not at once ejected from the premises. It passes belief that under such circumstances they were invited into the house, made much of, and treated as though the abominable relationship which they claimed was entirely acceptable to the Longworth family. This is all that it is necessary to say at present with reference to that testimony.

The story told by Mrs. Dick, who claims to have been Mr. Longworth's tenant, is no less repulsive or improbable. She states that on one occasion when Mr. L. came to collect the rent she told him that the daughter of her subtenant had given birth to an illegitimate child, and that Mr. Longworth expressed his sympathy for the girl for the reason that his daughter, Eliza, had had the same trouble with a river man; and she goes on to testify that later he brought Eliza, in his buggy, to her house, and that she showed the baby to her, and that she was a girl rather coarse-featured and very uncouth in her ways and manners; that she came there twice to see the baby, and said to her father that it looked like her baby, and she cried over it; also that Mr. Longworth told her that Eliza Longworth's baby was born in 1823, and was taken to a farm house in Campbell county, Ky. Mrs. Dick further testified that Mr. Longworth himself rented to her the house in which she then lived, on Race street, near Fourteenth, in February or March, 1844, and collected rents personally every month until January, 1846, when Andrew Lamb, who was his business assistant, began to collect them. She states particularly that he called for rent on the day before the birth of the illegitimate child, above referred to, which she testifies was on Thursday, the 13th of December, 1845. It turns out that that date fell on Saturday, and not on Thursday. From documentary evidence adduced by defendants it appears conclusively that between July 27, 1843, and April 30, 1845, Nicholas Longworth had no right, title, or interest

in the property which she says he rented to her in February or March, 1844, and thereafter personally collected the rent therefor until January, 1846. It further appears from letters sent by him through the mail, and produced on behalf of the defendants, and from the oral testimony of John L. Stettinius, that Nicholas Longworth left Cincinnati to go South on the 24th of December, 1843, and remained there until after February 24, 1844; how much longer does not appear. But from what is incontrovertibly shown it is manifest that he could not in person have rented her the property in the spring of 1844, both because he had no title to it and because he was not then present in the city. Her statement that he in person collected rents monthly until January, 1846, is refuted by correspondence in his own hand, which shows that he went South again on December 24, 1844, and was still there on February 5, 1845; also that he went to Newark, N. J., on June 25, 1845, and was absent until September 9, 1845. It was, therefore, impossible for him to collect the rent monthly, as she testified; nor would he have done so had he been in the city, for he had persons employed to do such work for him. Mr. Lamb had charge of that department of his business, and began collecting his rents June 5, 1845. There is nothing on his books to show any collection from Sarah Dick, or Sarah Callahan, as she was then called, or of Jackson Callahan, her husband. A rent ledger was kept, in which were entered the rents received from monthly tenants. Nothing appears showing any rents collected from this witness or her husband; nor were any rents collected from this house until August, 1846. Mrs. Dick testifies that she moved out of the house in 1846, because they were beginning to improve the Fourteenth street corner, just above where the house was, and she did not want to stay there while they were building. Certain contracts and deeds put in evidence by defendants establish conclusively that the Fourteenth street corner improvements were not entered upon until after April, 1847. Other tests of Mrs. Dick's evidence applied by cross-examination prove that her testimony is false. Among them was the altogether inaccurate description of the personal appearance of Eliza Longworth. But what has been said is enough to put it beyond reasonable doubt that the testimony of this witness is willfully perjured.

The complainant called as witnesses James E. and Mary J. Kercheval, who testified that in 1861 and 1862 one Ellen Thomas told them that she at one time was a domestic in the Nicholas Longworth household, and that while she was there Eliza Longworth gave birth to an illegitimate child. Mrs. K. testifies that Mrs. Thomas told her that when the baby was taken away Miss Eliza suffered intensely, was in agony, "and went into a long spell of sickness." That she ever had a long illness, or that her attendance at school was at any time interrupted by illness, is emphatically denied by witness after witness who knew her, and were her schoolmates and play fellows at and before and after the time referred to, locating it by any of the dates claimed. The testimony of these witnesses will be referred to more specifically in

another connection. The offer of this evidence—hearsay from one claiming to be a servant—was rested upon Eisenlord v. Clum, 126 N. Y. 552, 27 N. E. 1024. The case does not sustain the proposition. Jackson v. Cooley, 8 Johns. 128, is cited in the opinion to the point that to prove pedigree hearsay evidence of declarations of persons who, from their situation, were likely to know, is admissible when the person making the declaration is dead. On the other hand, Best, C. J., and Park and Burrough, JJ., in Johnson. v. Lawson, 2 Bing. 86, held that declarations of servants and intimate acquaintances were not admissible in questions of pedigree. But, even if the rule were as claimed by complainant, the existence of the relation of master and servant cannot be established by evidence of the declaration of the alleged servant any more than agency can be established by proof of the declaration of the alleged agent that he occupied that relation. The same rule applies to the testimony that a man claiming to be Nicholas Longworth's gardener made arrangements for taking the infant child to Kentucky. Aside from these objections, either Ellen Thomas told no such story to the Kerchevals, or, if she did, it was unqualifiedly false; for from the deposition of her own son, A. A. Thomas, taken by defendants, as well as from the record of her interment produced by defendants, it appears that she was born in 1819, and therefore that she could not have been a servant in the Longworth family in 1825, when she was only six years of age, or at any time prior thereto, 1825 being the latest date assigned for the birth of the complainant. As to Mrs. Kercheval's reliability as a witness, she testified to a visit by Mrs. Larz Anderson to Ellen Thomas while the latter was living at the Kercheval house, this being stated to have occurred shortly prior to Mrs. Anderson's trip to Europe, and within 10 years of the death of Mrs. Thomas, which occurred in 1884. It turns out that Mrs. Anderson was abroad but once, and that was long prior to the date named by Mrs. Kercheval. Four witnesses who were Mrs. Anderson's coachmen from prior to the alleged date of her visit until after Mrs. Thomas became blind, which was in 1874, testify that they never drove her there, and that she did not have such an equipage as Mrs. Kercheval describes.

In the course of the complainant's deposition he testified that he was adopted by his foster father and mother in 1839 by an act of the general assembly of the commonwealth of Kentucky, which reads as follows:

"Chap. 1052. An act for the benefit of John W. Flora.

"Whereas, James Flora, and Sarah, his wife, took charge of an infant boy, and have raised him, and are desirous that he should bear their name, and become their legal heir and representative, having no children of their own; therefore.

"Be it enacted by the general assembly of the commonwealth of Kentucky, that the boy aforesaid, shall be called and known by the name of John Wiggins Flora, and he is hereby made capable of inheriting the estate of said James Flora and Sarah, his wife, and to all intents and purposes be their legal heir and representative after their decease.

"Approved January 21, 1839."

Upon cross-examination his attention was called to the following amendatory act, of which he said he had never heard:

"Chapter 86. An act to amend an act, entitled: 'An act for the benefit of John W. Flora,' approved January 21, 1839.

"Be it enacted by the general assembly of the commonwealth of Kentucky, that the act entitled 'An act for the benefit of John W. Flora,' approved January 21, 1839, be so modified as to change the name of said John W. Flora to that of James W. Flora.

"Approved January 29, 1844."

The cross-examination also developed that there was still another act,—a formal act of adoption, passed at the December session, 1844, of the general assembly of the commonwealth of Kentucky, and found on page 126 of the Acts of that session. It is as follows:

"Chapter 93. An act for the benefit of John Wiggins Flora.

"Whereas, it is reported to the present general assembly of the commonwealth of Kentucky that John Wiggins Flora is the natural son of James Wiggins Flora and that said James Wiggins Flora desires that the said John Wiggins Flora be made capable of inheriting, by law; wherefore,

"Be it enacted by the general assembly of the commonwealth of Kentucky, that the said John Wiggins Flora be, and he is hereby made legitimate, and capable of inheritance, in law and equity, of all lands and tenements, goods and chattels, rights and credits of the said James Wiggins Flora, in as full and ample a manner as if he had been born in lawful wedlock.

"Approved January 24, 1845."

From the fact that the passage of this act was developed on cross-examination, and that complainant denied that he had ever before heard of it, or had any knowledge of it, it is seriously argued by his counsel that its passage must have been procured by the Longworth family in order to more successfully cover up the secret of complainant's birth. How it is possible to reconcile this proposition with the claim which is apparent throughout the entire testimony for the complainant that different members of the Longworth family freely and without solicitation acknowledged both to him and to others, including even servants and persons of low degree, the very secret referred to, is more than I can see. But there is not the slightest foundation in law or in reason for the presumption. To the impassioned inquiry by counsel for complainant how the defendants could have had knowledge of that act, and produced it, if they had not stimulated its passage, Judge Worthington, of counsel for defendants, quietly answered that in the course of his investigations he himself found both that and the preceding act passed in 1844.

According to a distinguished French jurist, quoted with approval by Mr. Best at page 48 of the introduction to his work on Evidence, while the law has established certain presumptions to which courts are obliged to conform, yet generally, the presumption, governed, as it necessarily is, by the light of reason, depends wholly on the discrimination of the judge. In this matter, if there be any presumption, it would seem to be that the act was promoted by James W. Flora, the foster father of complainant, for whose benefit it was expressly enacted. It is the adopting act. The act of 1839 only purported to confer upon complainant the

surname of his foster father and mother, and make him their heir. It did not fix the degree of his heirship. The complainant testifies that his foster father desired that he should inherit in preference to his foster father's brothers and sisters. Hence, presumptively, the motive and the necessity for the act of 1845, which differs from that of 1839, as counsel for defendants indicates, in this very particular; that while the act of 1839 declares him capable of inheriting, it does not fix his station in the ladder of inheritance, whereas that of 1845 puts him at the top of the ladder, which is precisely what, according to complainant's own testimony, his foster father wished. But, whatever the due weight of the presumption, it may be regarded, for the purposes of the case, as but slight, and by no means conclusive. So far, however, as it can have any bearing, it must be against the complainant.

The complainant also offered the testimony of 30 witnesses to rumors or reports prevalent in Cincinnati and in Campbell county, Ky., that Eliza Longworth had given birth to an illegitimate child. Eleven of these witnesses testify that they had heard such rumors in Cincinnati between 1830 and 1850. Not one of these 11 was even acquainted with the Longworth family. The date of the supposed birth of the child is not given, nor is the hearsay testimony connected in any manner with the complainant. The other 19 witnesses testify that it was commonly reported in the neighborhood where complainant lived in Kentucky that he belonged to the Longworth family; some saying that he was supposed to be a grandson of Nicholas Longworth, but that they had never heard who was his mother, and some that they had understood that Eliza Longworth was his mother. All this testimony would be utterly and entirely incompetent for any purpose but for an averment in the answer that the claim set up by the complainant was carefully concealed and suppressed during the lifetime of Nicholas Longworth and afterwards, so that it was never heard of by any one until after the death of Mrs. Flagg. It would have been competent for the defendants to establish that fact, if it is a fact, and therefore it was competent for the complainant, in refutation or in answer to that averment, to prove the existence during the lifetime of Mr. Longworth and of Mrs. Flagg of rumors to the contrary. That testimony cannot be used for any other purpose or to establish any other fact. It seems, however, to be relied upon by counsel for the complainant to make weight for their client. Against this testimony is that of numerous old acquaintances of the family, including ladies who were schoolmates of Eliza Longworth, and knew her intimately in her childhood and girlhood, that they never heard of any rumor or intimation of the sort. In the testimony of Mrs. Goodman, an old and esteemed resident of Cincinnati, who was well acquainted with the Longworth family and knew Eliza Longworth from her girlhood until her death, it appears that Mrs. Stettinius, who was a daughter of Nicholas Longworth, died a widow, in January, 1837, leaving only one child, her son, John L., who was born in August, 1832. Her home and that of her child was at Mr. Longworth's house. The care of the child,

from his infancy, had been largely taken by Eliza Longworth, and after his mother's death she had sole charge of him. Mrs. Goodman (who was 91 years of age when she gave her testimony) says that Eliza cared for him just like a mother; that she called him her baby; that was her pet name for him; and that she was accustomed to take him out riding, sometimes in a carriage, sometimes in a buggy. These facts and incidents are enough, as gossip and scandals bred of jealousy, envy, or a habit of detraction are born, to account for the rumors said to have been current between 1830 and 1850 among a class of people who had no association with and were not known by the Longworth family. It is significant that the rumors referred to did not antedate the birth of John Stettinius. As to the Kentucky rumors, it is sufficient to say that they existed only among persons who were total strangers to the Longworth family, and that they were founded altogether upon hearsay.

We turn now to testimony for the defendants. Ten old citizens of Cincinnati, to wit, William S. Groesbeck, James P. Kilbreath, Gen. Joshua H. Bates, Ben. B. Whiteman, Judge C. P. James, John Kennett, and Alexander H. McGuffey; also Mary E. Thomas, Mrs. Margaret Goodman, Mrs. Carrie W. Blair, and Mrs. M. L. Lowe,— testify that Mrs. Flagg was always received in the best society in Cincinnati, and gladly welcomed; and they also, together with Robert Hosea, Judge A. J. Prusen, George F. Nirber, Thomas McLean, and Jeremiah Kiersted, declare that no report was ever current in Cincinnati that she had given birth to a bastard child.

It appears from the testimony of Mrs. Donne, Mrs. J. J. Patterson, Mrs. Mary B. Ewing, and Mrs. Francis W. Lynn that Mrs. Flagg attended Dr. Locke's school in Cincinnati, where they were pupils, from September, 1822, to August, 1827. Vacation occurred each year only in the month of August. Mrs. Flagg, or Eliza Longworth as she was then, took a medal almost every year, as was shown by the newspaper advertisements, proved in Miss Alice McLean's testimony taken for defendants. The witnesses named were her schoolmates. They all testify to her continual good health and spirits during all the years above mentioned, and her constant attendance at school. They deny that she had at any time any illness which interrupted her studies. Their testimony entirely refutes the alleged statements of Ellen Thomas as detailed by Mrs. Kercheval in her evidence. To the same effect, for the period prior to 1822, is the testimony of Miss James, born on the 6th of January, 1809, and, when her deposition was taken, resident of Washington, D. C. Her parents removed from Virginia to Cincinnati in 1813, and from that time until 1825 lived in the immediate vicinity of the residence of Mr. Longworth. She was well acquainted with the Longworth family, and was a schoolmate of Eliza from the time when they were eight years of age; Eliza having been born in the same year as herself. They went to Miss Bailey's school in 1821, and continued there until Dr. Locke came to Cincinnati, which was in 1822. She always remained at Miss Bailey's school. Up to the time when Eliza went to Dr. Locke's

school, they were about as intimate as school girls could be, and she frequently went with her to her home, and remained all night. The friendship continued after Eliza commenced Dr. Locke's school, but they were not so constantly in each other's company. She testifies that Eliza was a healthy girl, was never ill for any length of time, was always happy, never in any way wild or frivolous, and that there was nothing at all against her reputation that she ever knew or heard of. She was very much liked and held in high esteem among the scholars. She never saw or heard of anything indicating any immorality or irregularity in her life. To the same effect is the testimony of Mrs. Emma A. Gibson, not a schoolmate, but a friend, and almost daily companion; and Mrs. Laura Slade, a companion at dancing school for a short period in 1824.

The population of Cincinnati in 1820, according to the census of that year, was 9,642; in November, 1824, according to the Cincinnati Directory for 1825, it was 12,016. Eliza Longworth was born December 9, 1809. The defendants rely upon the extreme improbability—indeed, the impossibility—of her becoming the mother of an illegitimate child in the last of June or early in July of 1823 or 1824, or even 1825, in a place no more populous than Cincinnati then was, and in the social relations which she enjoyed, without the fact having become known to her schoolmates and to the community generally. But the crucial test which they apply to the complainant's case is the true date of his birth. They say that there was one living witness who probably had exact personal knowledge as to that date,—Lucinda Dunlop. She was called by complainant, but her knowledge did not appear from her first examination. She then testified that she came to Campbell county in 1818 or 1819, and that complainant came to the Flora family from one to six years after her arrival in Campbell county. When the typewritten transcript of her evidence was presented to her for signature by Mr. Traub, examiner, she refused, as he testifies, to sign it, unless the statement as to the date were so altered as to show that Flora's arrival was very nearly at the same date as the birth of William I. Newman. The examiner declined to permit the correction until he had consulted counsel. Having called them together, he disclosed the matter to counsel on both sides. Defendants' counsel then proposed that the witness be re-examined forthwith, or that the examiner take her statement in the absence of counsel, both of which propositions were refused by counsel for complainant, and the decision of what was to be done was postponed. This was on Saturday. On the following Monday the examiner was notified by complainant's counsel that Mrs. Dunlop would sign her deposition, and he took her signature without further conference with defendants' counsel. Afterwards defendants took the deposition of this witness on further cross-examination, wherein she testified that her knowledge as to the particular identity of the age of William I. Newman and the complainant was hearsay, and, further, that she had signed the report of her original examination upon the solicitation of one of the counsel for the complainant (not, however, any one of the counsel who took part in the oral argument

in the cause), who visited her without knowledge of defendants' counsel, after Mr. Traub had made the disclosure above mentioned to counsel in the case, and before he obtained her signature. The significance of the identity of date in the birth of John Flora and William I. Newman is made manifest by the fact, established by the Newman family record and the inscription on his tombstone, that William I. Newman was born June 28, 1820. If the complainant was born in July, 1820 (and that the 2d of July is the correct statement of the day and the month of his birth is not in dispute), he must have been conceived in September or October, 1819. As Eliza Longworth was then nine years and nine or ten months old, it is impossible that she could have been his mother. That complainant was of the same age as William I. Newman, and was suckled by William Newman's mother but a few days after his birth, is testified to by complainant's witness Virinda S. Wiley, who was William Newman's sister, upon information derived from her mother.

The complainant introduces in evidence the copy of a letter written by him to Mr. and Mrs. Flagg, and the original of the answer written by Mrs. Flagg. The defendants rely upon those letters as strong corroborative evidence that Flora himself understood that he was born in 1820, and also that Mrs. Flagg was entirely innocent of what was, after her death, laid to her charge by the bringing of this suit. The copy of complainant's letter was written by him, according to his testimony, on a page of a blank book, which is produced. It is as follows:

November 20th, 1876.
Carthage Campbell County Kentucky.

Mr. W. J. & Eliza Flagg
   No 7 east 28 street
      New York city. N. Y.
Dear Frends
   Ples give me som Infomation as too my origan as I have bin told you can by the old Cittins of this county I am the man that was Brought Frome the city of Cincinnatia to James W. flora and Sarah flora his Wife by a man Who said he was Nickles Longworth Gardner when quit a Infant it was in the year of 1820 (?) [20 or 24 (?)] and the mont of July this I have been told by Davis Cornel Elig Rievs and other old citens you will ples giv me your Information in every way you see proper and much oblidge a Frend Who Sings his name by Adolitian

John W. Flora

N. B. Send your letter to Newport Ky

By "adolitian" he probably meant "adoption."
Mrs. Flagg's letter is as follows:

November 25th.
I have just received your letter. I very much regret I am entirely in the dark concerning the question you ask me. In 1820 I was so small a child that I knew nothing of you. I have never since heard anything relating to anything you ask me. I very much regret my inability to relieve your mind. Neither do I know anyone now living who can give you any information.
   Yours, truly,                Mrs. Wm. J. Flagg.

The copy of complainant's letter is inserted above as it is printed in the complainant's record. In the copy as it appears in the complainant's blank book, in his own handwriting, the figures "20" in "1820"

have been partially obliterated, and "20 or 24" written or interlined immediately above. This is so palpable that the counsel for complainant called upon their client, when he was giving his deposition, for an explanation. He stated that he could not tell when the figures 20 and 24 were interlined, but, in answer to the next question, that they were written at the time when the copy was originally made, adding, "That is what they told me," but that he knew nothing about the erasure of the 20; that he did not do it. That he makes no reference to Mrs. Kautz, nor to the invitations which he testifies she bore to him, and that he gives an account of himself as though he was conscious that neither Mr. nor Mrs. Flagg might recognize from his name who he was, or anything concerning him, and that, on the other hand, he writes as though he was a total stranger to them, are circumstances so strongly at variance with and in contradiction of his testimony concerning Mrs. Kautz's visits and of her statements to him as to seriously discredit not only that testimony, but the complainant's entire deposition. That, he says, is the only correspondence he ever had with Mr. and Mrs. Flagg. The letter of Mrs. Flagg, dated five days after the date of the complainant's letter, refers only to the date 1820, which strongly, if not conclusively, indicates that the letter she received contained that date only. This circumstance is of the highest significance. Counsel for the complainant comment upon the fact that Mrs. Flagg answered the complainant's letter at all, but the answer seems to this court to be such a one as a woman of a kind heart and benevolent disposition, guiltless withal of any wrong, would naturally write; and how any comment detrimental to her or comforting to the complainant can be properly made upon her writing or sending it the court is not able to perceive. All the inferences are decidedly the other way. But counsel for the complainant call attention to the fact that Mr. Flagg, her husband, admitted upon the stand that he never knew anything of this correspondence, and why should it have been concealed from him? The answer is not at all difficult. Mrs. Flagg was the daughter of a man of marvelous capacity for the transaction of business. By his wonderful sagacity, foresight, and skill he accumulated a fortune,—the largest ever made in the city of Cincinnati, and one of the largest in the West. It is natural to infer that his daughter inherited something, at least, of his ability. She received a letter from a manifestly illiterate man concerning a matter of which she knew nothing, and had heard nothing; and she at once took her pen, dashed off a few lines which constitute the answer, signed it, sealed it, mailed it, and that was the end of the matter with her. It was not anything of special consequence to be either treasured in her own memory or mentioned to her husband. Certainly a guilty woman would not have taken that course. This correspondence furnishes, in the opinion of the court, one of the most convincing bits of evidence in the case in favor of the defendants. But this is by no means all. The defendants rely upon the complainant's own testimony to prove that he must have been at least 21 years of age in 1843, and that there is no foundation for the claim of any later date than 1822 for his birth. He testifies that he was married June 6,

1843. The statutes of Kentucky then in force (2 Morehead & B. St. p. 1154) required the consent of parent or guardian to the marriage of any person under the age of 21 years, as well as a bond in all cases. His marriage license, which is·in evidence, shows consent for his wife, but not for himself. It shows also that he signed a bond. His statement, in brief, is that his foster father sent him to the clerk for his license without a written permit, and with a witness to prove that he was under 21 years of age, and that the clerk, with knowl-edge of that fact, issued a license to him without a permit. Who was the witness? Could any one have been, excepting his foster father or mother? The statement is not worthy of belief. The law is plain. ' The issuing of the license under the facts stated would have subjected the clerk to a severe penalty. Why should he vol-untarily and unnecessarily have incurred the risk? Why not have sent complainant back for the consent? Why should the fos-ter father send a witness along to prove that a consent was neces-sary, and omit sending the consent? Why did he not send the consent which was necessary, and omit the witness who was not necessary? It could not have been an oversight, because the con-sent for the wife was furnished.

Complainant's Family Bible, containing the family record, is in evidence. It is referred to in his testimony and in the testimony of W. B. Flora, his son. The first entry is of complainant's birth. It shows that it was originally written: "John W. Flora. Born July 2, 1820," and that it now reads, "Born July 2, 1824, or 25." The "0" has been changed to a "4," and the stroke of the change and the words "or 25" are in different ink. That the change of the "0" to the "4" has been made is quite apparent. The only reason complainant gives for the change is that after the entry was made he was told by some old persons that he was born in 1824 or 1825. From whom could he have obtained the informa-tion upon which he made the original entry excepting from his foster father or mother? Why did he, by making the change, discredit them;—the only persons having positive knowledge,—and substitute another date upon the mere hearsay statements of oth-ers who had no positive knowledge? In August, 1844, he had been told, according to his own statement, by his foster mother's mother, upon the ·occasion of the birth of his oldest son, that he was then 21 years and 1 month old. With that information he cast his first vote in that month. In June, 1843, according to his own statement, upon the occasion of his marriage, he had been told by his foster father that he would be 20 in July, 1843, and yet he testifies that in 1845 or 1846, when making up a permanent rec-ord of his own birth, he put down the day of his birth as July 2, 1824, or 1825, which would make him 18 or 19 in July, 1843.

The argument for the defendants in reference to a motive for the alteration of the date in the record is that when complainant made the entry originally, or caused it to be made, he did not know Mrs. Flagg's age. That was first brought to his knowledge when the announcement of her death was made, as appears from the notice introduced by him, which shows that she died December 13, 1891,

at the age of 82 years, and consequently that she was only a little over 10 years of age in July, 1820, the date assigned for his birth. Hence the necessity for making the alteration in the copy of the letter which he had written to Mrs. Flagg and in the family record, or of giving up his pretended claim to two-twelfths of the Longworth estate, which, if he succeeded in establishing, would make him more than a millionaire.

The defendants offered in evidence abstracts of the United States census official returns as to the families of James W. Flora, the foster father of complainant, and John W. Flora, the complainant, duly certified from the department of the interior for the several censuses from 1820 to 1890, both inclusive. It appears from the evidence of the complainant himself as a witness in this case that there was not in Campbell county, Ky., at any time, any other family by the name of Flora, of which he had ever heard; nor was there any person in that county bearing that surname, other than his foster father and mother and his own immediate family, excepting Robert Flora, brother of his foster father. Robert lived with the complainant for some little time after complainant's foster father's death. These census returns show that the age of John W. Flora, complainant, was always computed as if he had been born in the year 1820. That such documents, being official registers, are admissible in evidence in so far as they contain statements as to matters which the law requires should be inquired into, reported upon, and then recorded, see 1 Greenl. Ev. § 483, and Steph. Dig. Ev. art. 34.

The statutes under which these census returns were compiled are as follows: For the fourth census,—that of 1820,—Act March 14, 1820 (3 Stat. 548); for the fifth census,—that of 1830,—Act March 23, 1830 (4 Stat. 383); for the sixth census,—that of 1840,—Act March 3, 1839, and Act Feb. 26, 1840 (5 Stat. 331, 368); for the seventh and eighth censuses,—those of 1850 and 1869,—Act May 23, 1850, and Act Aug. 30, 1850 (9 Stat. 428, 445); for the ninth census,—that of 1870,—the act the same as for the census of 1860, and in addition Act May 6, 1870 (16 Stat. 118); for the tenth census,— that of 1880,—Act March 3, 1879 (20 Stat. 475); for the eleventh census,—that of 1890,—Act March 1, 1889 (25 Stat. 760); and Acts Feb. 22, 1890, and Aug. 14, 1890 (26 Stat. 13, 313). Examination of these statutes will show that as to each census the enumerator was required by the law itself, and not merely by the direction of his superior officers, to investigate and record the particular matters which are shown in the abstract for that census; and that this investigation was to be made, where practicable, by inquiry from the head of the household in question. These records, therefore, are not simply public records, made for the express purpose of ascertaining and preserving proof of the facts there contained, but are records made by an officer under his official oath of declarations as to matters of pedigree, by persons whose declarations are competent proof upon that subject.

In the censuses of 1820, 1830, and 1840 the names of subordinates of the family do not appear, nor their ages, but in each of the re-

turns made by complainant's foster father there appears the record of a male white child, under 10 years in 1820, over 10 and under 15 in 1830, and over 15 and under 20 in 1840. The complainant was the only white male child about the premises, as shown by his own testimony, as well as by that of others. In other censuses he is referred to by name, with age as follows: 1850, 30 years; 1860, 41 years; 1870, 49 years; 1880, 60 years; 1890, 69 years. The variations of one year—see returns of 1860, 1870, and 1890—are only apparent, not real, as is shown by the testimony of W. H. Wagoner, complainant's witness, who, as enumerator, in 1870, took complainant's return for that year. He states that they were required to take the age at the last birthday before the 1st day of June of that year. Accordingly the return, truly interpreted, gave his age on July 2, 1869, which was 49 years. So in 1890 the act required (section 9) that the age be returned as of June 1st of that year, at which date complainant was not yet 70, and so he was returned as 69. There is no explanation given in the testimony as to the census of 1860. That enumeration was taken August 28th of that year, and, as there was no date fixed by the statute then in force, and the complainant had passed his fortieth birthday, it is a fair presumption that the enumerator therefore reported him 41 years of age. That he was born in 1820 is confirmed also by the papers from the war department at Washington, showing his enrollment and exemption in the draft of 1863 and 1864. The complainant is there returned as having been 43 years of age on July 1, 1863. The complainant has called five witnesses resident in Campbell county, Ky., who testify that the provost marshal did not ask them their ages when enrolling them for draft. Their testimony is incompetent and irrelevant, because the provost marshal's action as to those witnesses does not prove or tend to prove his rule of conduct or action as to complainant.

That the complainant was born in 1820 is established further by the ages given in the returns of the county assessors of Campbell county, Ky., which were offered in evidence by defendants. The complainant called in rebuttal Joseph Herringer and T. V. Wiley, deputy assessors. It appears from the testimony of Herringer that the information as to the age was used for making up the list of persons between the ages of 18 and 50, such persons being liable to work on the roads. He says that in the fall of 1893 he took complainant's assessment, who then stated that he was born in 1823 or 1824, as he had understood from what certain old men had told him, and that he then put his age as 73, and that witness so recorded it, as he says, in a "hurm squirm way," because he was not particular, inasmuch as complainant was over 50; and that in 1894, he made returns of complainant's age by referring to the return of the previous year, and making it one year older. This witness, however, is in direct conflict with the complainant himself, who testifies that he personally made no return, either in 1893 or in 1894. Wiley testifies that in 1891 he put complainant's age at 71, because complainant told him that he was born from 1820 to 1825. Upon the other hand, defendants examined George W. White,

who testified that he was deputy assessor 10 years. He took the assessment of complainant in 1887 and 1888, and testifies that he took no man's age without making inquiry, and that he never reported any man's age differently from what it was stated to him.

Here we have, in official census returns, in returns of the draft from the war department, in local assessment returns, taken severally, at different times, by different sets of officials, acting independently of each other, all these together covering a period of more than 70 years, a concurrence of statements made upon data some of which was furnished by complainant's foster father and the rest by the complainant himself, all pointing to 1820, when Eliza Longworth was a mere child, less than 11 years of age, as the date of complainant's birth. And these statements agree exactly with complainant's family record and his copy of his letter to Mrs. Flagg before they were so altered as to correspond with the date indispensable to the complainant's bastard claim. This concurrence is not fortuitous. The force of these statements cannot be broken. They give the lie to the pretense that the complainant or his foster father at any time in good faith understood that he was born in 1823 or 1824 or 1825, and they establish beyond a peradventure that their true understanding was that complainant was born July 2, 1820, when Eliza Longworth was but 10 years and 7 months old. The complainant's foster father knew exactly when the complainant, an infant, was left at his house, and therefore his understanding as evidenced by the earlier census returns,—the first one made in 1820,—when there was no conceivable motive for falsification, imports absolute verity. The silent, but irrefutable, testimony of these several official returns is of itself sufficient to reveal the utter dishonesty and falsity of the case attempted to be made out on behalf of the complainant.

There is one witness, however, whose testimony, if true, is absolutely and entirely conclusive against the complainant's claim. That witness is William J. Flagg, who was the husband of Eliza Longworth. Upon his oath he says that she was a virgin when he married her. That this testimony is true this court has not the least doubt. The only answer to it is a sneer and a tirade against him as an adventurer, who married for money. He was a lawyer in good standing and practice in New York City. He came to Cincinnati on a visit to his sister, who was the wife of A. E. Gwynne, Judge Bellamy Storer's law partner, and himself an excellent lawyer of high standing. He met Miss Eliza Longworth, and courtship and marriage followed. His niece is Mrs. Cornelius Vanderbilt. He is of good family, and there is nothing in himself or in his surroundings to justify the vituperation cast upon him.

But, passing now from the facts to the law of this case, the following propositions are so well established as to be part of the settled law:

1. The law resorts to hearsay evidence in cases of pedigree, upon the ground of the interest of the declarants in the persons from whom the descent is made out, and their consequent interest in knowing the connections of the family. The rule of admission

is, therefore, restricted to the declarations of deceased persons who were related by blood or marriage to the person, and in that way interested in the succession in question.     Greenl. Ev. § 103.

The rule is stated in Taylor on Evidence (volume 1, § 579), as follows:

"Though it was long doubtful whether the declarations of servants, friends, and neighbors might not be received, the settled rule of admission is now restricted to hearsay proceeding from persons who were de jure related by blood or marriage to the family in question, and who, consequently, may be supposed to have had the greatest interest in seeking the best opportunity for obtaining, and the least reason for falsifying, information on the subject."

In Blackburn v. Crawfords, 3 Wall. 175, Justice Swayne, pronouncing the opinion of the supreme court of the United States, after quoting the passage from Greenleaf above cited, added, "It is well settled that before the declaration can be admitted the relationship of the declarant to the family must be established by other testimony," citing 1 Tayl. Ev. § 576.     Blackburn v. Crawfords, is cited with approval in Fulkerson v. Holmes, 117 U. S., at page 397, 6 Sup. Ct. 780, where several other cases to the same point are cited.     The application of this rule, even if it be admitted that it applies in cases of illegitimacy, wipes out all the hearsay evidence offered for complainant (excepting evidence of rumors, which is relevant only on the one point hereinbefore pointed out, and available for no other purpose whatever), and leaves only evidence tending to prove statements made by members of the Longworth family.     That evidence has already been sufficiently considered.

2. The rule that hearsay is admissible in cases of pedigree is limited to cases of legitimate relationship.     In such cases the presumption is that declarations by deceased members of the family are true, because ordinarily there is no motive for false statements, as there is likely to be in cases of illegitimacy.     In Crispin v. Doglioni, 3 Swab. & Tr. 44, decided by Sir C. Cresswell in 1863, the question was as to the right of succession to property, the decedent having been a citizen of Portugal, where, under the law, bastards inherited from the father in default of lawful issue.     The plaintiff claimed to be the bastard son of the decedent, and therefore entitled, under the law of Portugal, to his personal property. The defendant was a sister of the decedent, and denied that the plaintiff was his son.     The declarations of a brother of the deceased, tending to show that the plaintiff was the bastard son of the deceased, were offered.     The judge said:

"I can well understand that where a matter is likely to be discussed and well known in a family, a member of the family may be allowed to give evidence of it; but in this case plaintiff, according to his own account, is filius nullius by our law. The question is whether a declaration of one member may be admitted to another member of having had intercourse with a woman, and having had a child by her. I think it ought to be excluded."

Where a relationship is acknowledged as a matter of fact, and its lawfulness only is disputed, hearsay from members of the family may be introduced to show that such relationship was lawful or was not lawful.     But hearsay cannot be introduced to estab-

lish an unlawful relationship per se, where a lawful relationship is not claimed. There are cases in which testimony as to declarations of members of the family has been admitted to show that the claimant was a bastard. But on examination it will appear that in those cases the testimony was introduced, not to show bastardy per se, as a ground of claim, but to dispute a claim of legitimacy. Vowles v. Young, 13 Ves. 147; Goodright v. Moss, Cowp. 593; Murray v. Milner, 12 Ch. Div. 845; Jewel v. Jewel, 1 How. 219; Haddock v. Railroad, 3 Allen, 298. In Doe v. Barton, 2 Moody & R. 28, the declarations of illegitimate relations were rejected. See, also, Barnum v. Barnum, 42 Md. 251, 304; Richmond v. State, 19 Wis. 307; and Shoppert v. Nierle (Neb.) 63 N. W. 383. The only exception to the rule is in India, where, under Act 2 of 1855, § 47, declarations of illegitimate members of the family, and also of persons who, though not related by blood or marriage to the family, were intimately acquainted with its members, were made admissible after the death of the declarants in the same manner and to the same extent as those of deceased members of the family. But that is a statutory rule. Whether illegitimacy is reputable in that country, and the statute was for that reason enacted, or whether it was enacted because Great Britain makes her experiments, in legislation as in other matters, upon her colonies and dependencies, it is not of importance to inquire. Under the application of the rule in force here, what was left of complainant's case under the first proposition of law is entirely barren of proof.

3. Even if every fact claimed in support of the complainant's case were established by competent and conclusive evidence, there would be no equity in his claim. This proposition was fully considered and passed upon by this court in this case upon exceptions to the bill. See 67 Fed. 182. Upon the authority of Gibson v. McNeely, 11 Ohio St. 131, it was then held that under the clause in Mr. Longworth's will devising two-twelfths of his estate in trust for the benefit of his daughter, Eliza L. Flagg, during her life, with remainder to the "issue of her body surviving her," complainant could not take, for the reason that, even if he were the illegitimate son of Eliza L. Flagg, he would not be included in the meaning of the phrase, "the issue of her body surviving her." That phrase applies only to legitimate children. An elaborate brief has been filed for the complainant in support of the contention that under the statute of descents of 1853, in force when Nicholas Longworth's will was made, a bastard could inherit directly from his mother's parents, assuming both the parents and the bastard to have survived the bastard's mother. It is to be remarked right here that, if the complainant takes at all under the will of Nicholas Longworth, it is not from Mrs. Flagg, but from Mr. Longworth, under the terms of the devise. The statutory proposition referred to is as follows:

"Bastards shall be capable of inheriting or of transmitting inheritance on the part of their mother in like manner as if they had been born in lawful

wedlock. And if the mother be dead, the estate of such bastard shall descend to the relatives on the part of the mother as· if the intestate had been legitimate." Laws Ohio 1853.

The contention for the complainant is that under this statute he might receive from or transmit to lineal ascendants or descendants of his mother. Counsel for defendants insist that the true construction is that the bastard and his descendants might receive from his mother, and that he might transmit to his mother, and that it reaches no further. That, in my opinion, is the true construction. It seems to me to be the settled law of Ohio under Little v. Lake, 8 Ohio, 289, which was followed as an established rule of property in Gibson v. McNeely, 11 Ohio St. 131, and in Hawkins v. Jones, 19 Ohio St. 22. I am unable to concur in the proposition made by counsel for the complainant that the statute referred to qualifies the rule laid down in Gibson v. McNeely. The rule there stated is positive and unequivocal. It is a rule of property established by the supreme court of the state, and binding upon the federal courts. It results that there can be no construction of the facts in this case which would entitle the complainant to take under the devise to the issue of the body of Eliza Flagg.

To put the case in a nutshell: If all the facts as claimed for the complainant be conceded in every particular, he has no standing upon the proper construction of the law. On the other hand, if the law be conceded to be, in every particular, as claimed for the complainant, he has no standing upon the proper construction of the facts. In short, in whatever aspect the case may be viewed, there is no merit in it. It has been considered not only upon the testimony, competent and relevant, and upon the law, but also upon the testimony, competent and incompetent, relevant and irrelevant, for the reason that the complainant's claim assails the character and reputation of the family to which the defendants belong, and it hurts the living by charging infamy upon one of their dead. In its effect—I refer not to motive or intent—such a case and such a claim, unfounded either in fact or in law, must be regarded as more cruel than the grave. The defendants are entitled, therefore, not merely to be discharged upon the application of technical rules of evidence and upon the law, but also to complete vindication upon the case as presented, in order that their family name and honor, and the memory of their dead, may remain to them unsullied and unstained by the mass of hearsay and rumor and scandal and falsehood which has been marshaled against them.

The bill will be dismissed, at the cost of the complainant.