On motion to affirm, argued August 10, decided August 17, 1909.   On the
merits argued October 6, decided November 15, 1909.   Rehearing
denied January 18.   Further rehearing denied February 15, 1910.

## STATE v. McDONALD.

[103 Pac. 512; 104 Pac. 967; 106 Pac. 444.]

APPEAL AND ERROR—BRIEFS—FILING—TIME—SUBMISSION.

1. Where the briefs of both parties had been filed, and the submission
removed the case from the operation of the rules regulating the time for
filing briefs, respondent was not entitled to have the judgment affirmed for
appellant's failure to file a brief within the time specified in the rules.

ESCHEAT—STATUTES—CONSTRUCTION—PLEADING—SEVERAL   CAUSES   OF
ACTION.

2. Act February 19, 1903 (Laws 1903, p. 127), § 4, provides that
whenever the Governor is informed, or has reason to believe, that any
property (real, personal, or mixed) has escheated to the State, he shall
direct the district attorney of the judicial district in which such property
may be, to file information setting forth the facts, etc.   *Held,* that such
statute contemplated but one proceeding to escheat all of decedent's
property subject thereto, and hence an information was not demurrable
as misjoining several causes of action because both real and personal
property sought to be escheated were separately alleged.

APPEAL AND ERROR—JOINT TRIAL—RIGHT TO SEVERANCE—WAIVER.

3. Where, in escheat proceedings, the claimants or defendants proceed
to a joint trial without objection, they could not claim on appeal that
they were entitled to a severance.

COURTS—COUNTY COURTS—JURISDICTION—CONSTITUTIONAL PROVISIONS.

4. Under Section 12, Article VII, Constitution of Oregon, declaring that
the county courts shall have the jurisdiction pertaining to probate courts,
and such other powers and duties as may be prescribed by law, the legis-
lature had no power to deprive county courts of common-law jurisdiction
inherent in probate courts at the time of the adoption of the constitution,
which included the right to determine heirship as an incident to the
distribution of intestate's estates.

COURTS—COUNTY COURTS—JURISDICTION—STATUTES.

5. Laws 1903, p. 128, § 5, providing that, if an information to escheat
an estate has been filed in a certain court and a summons issued and
served, the county court shall be ousted of jurisdiction to determine
heirship or right of claimants to the estate, except as to the claims of
creditors, etc., in so far as it attempted to oust the county court of
jurisdiction to determine heirship for the distribution of personal estate
of a decedent in process of administration therein, was in violation of
Section 12, Article VII, Constitution of Oregon, establishing the jurisdiction
of county courts.

COURTS—CONFLICTING JURISDICTION—ESCHEAT PROCEEDINGS.

6. The circuit court in escheat proceedings cannot assume jurisdiction
over the personalty of a decedent until the county court has completed
the administration of the estate and adjudged that there is no lawful
claimant, though the circuit court is entitled, independent of the county
court, to take jurisdiction and adjudicate on the devolution of the title
to realty.

ESCHEAT—NATURE OF PROCEEDINGS—LAW OR EQUITY.

7. A proceeding to escheat the property of a deceased person for want of heirs, as authorized by act February 19, 1903 (Laws 1903, p. 127), is a proceeding at law.

APPEAL AND ERROR—QUESTIONS OF FACT—REVIEW—RECORD.

8. Where a motion to suppress depositions was heard by the trial court on affidavits and counter affidavits, which were not preserved by bill of exceptions, the ruling could not be reviewed on appeal.

DEPOSITIONS—INFIRM PERSONS—INABILITY TO APPEAR—EVIDENCE—DISCRETION.

9. Where a witness was 70 years of age, infirm, and afflicted with chronic ailments, whether she was unable to appear so as to authorize the reading of her deposition, was within the discretion of the trial court.

EVIDENCE—DECLARATIONS OF DECEASED PERSON—PEDIGREE—RELATIONSHIP.

10. Where a witness is offered to testify to declarations of a deceased person, who is related to a family, as to the pedigree of some other person with relation to that family, the relationship of the declarant to the family must be shown by other evidence than the declarant's assertions before such declarations may be admitted.

BASTARDS—EVIDENCE OF ILLEGITIMACY.

11. A witness who had known deceased from childhood was properly admitted to testify on an issue of pedigree that deceased had lived at the house of witness' mother until he left Scotland for America when he was 16 or 17 years old; that witness' mother raised him from birth to boyhood, until he left the country, furnished him with colthing, medicine, etc., that deceased was the illegimitate son of F., with whom witness was personally acquainted, and who was one of witness' close neighbors, and that after the birth of deceased F. came to the home of witness' mother several times and called deceased "her boy," and he called her "mother."

EVIDENCE—ILLEGITIMACY—DECLARATIONS OF INTESTATE.

12. Declarations or acts of an intestate tending to show his own illegitimacy, are admissible as against those claiming under the intestate.

EVIDENCE—ILLEGITIMACY—DECLARATIONS OF PUTATIVE MOTHER.

13. Declarations or acts of the putative mother are admissible to prove the illegitimacy of a child.

EVIDENCE—PEDIGREE—DECLARATIONS OF MEMBERS OF FAMILY—RELATIONSHIP.

14. Where after deceased was born as the alleged illegitimate son of F., he was placed in the family of the sister of his alleged father, who raised him until he was 16 or 17 years old, when he left the country, declarations of the sister as to decedent's parentage were competent on an issue of pedigree, though the sister's relationship to deceased was de facto and not de jure.

EVIDENCE—DECLARATIONS—PEDIGREE.

15. Where a non-resident claimed a share in decedent's estate, on the theory that he was decedent's full brother, his declarations that decedent was his illegitimate half-brother, and that decedent's mother was a woman in Scotland whom he never knew, were admissible against the declarant as an admission against interest.

EVIDENCE—DECLARATIONS—PEDIGREE.

16. Such declarations were also admissible as declarations of a member of the family as to pedigree, under Section 700, B. & C. Comp., providing that the declaration, act, or admission of a member of the family, who is deceased or out of the State, is admissible as evidence of common reputation in cases where, on questions of pedigree, such reputation is admissible.

BASTARDS—EVIDENCE AS TO LEGITIMACY—LETTERS.

17. Letters of an alleged father to his son, addressing him as his son, would be construed *prima facie* to mean his legitimate son.

EVIDENCE—PEDIGREE—REPUTATION.

18. On an issue as to the pedigree of deceased, an alleged illegitimate son, a neighbor, not related to either branch of decedent's alleged family, though having known both families of decedent's putative relations from his earliest recollection, was incompetent to testify that F. was decedent's mother, under the rule that common reputation on the subject of a person's parentage, whose pedigree is in dispute, is inadmissible.

[This part of the opinion was overruled in deciding the motion for rehearing.   See Syllabus 33.—Reporter.]

EVIDENCE—DECLARATIONS—PEDIGREE—RELATIONSHIP OF DECLARANT.

19. To render declarations, affecting pedigree, admissible, it must appear that the declarant, or the source of the witness' information, was a member of the family, or related to the family whose history the fact concerns, and the declarant must be dead or be out of the State.

EVIDENCE—PEDIGREE—DECLARATIONS—BY WHOM MADE.

20. On an issue of pedigree, testimony of declarations of decedent's administrator, who was not connected with the M. family, that there was an existing tradition in that family as to decedent's relationship to it, was admissible.

EVIDENCE—FOREIGN LAWS—OFFICIAL PUBLICATION.

21. Under Section 788, subd. 36, B. & C. Comp., providing that it shall be presumed that a book, purporting to be printed and published by public authority, was so printed and published, a pamphlet consisting of 13 printed pages, bound or tied together by a linen thread, constituting a complete statute of the Dominion of New Zealand, relating to the registration of births and deaths, on the last page of which, at the conclusion of the subject-matter, were the words: "Wellington, New Zealand; printed under the authority of the New Zealand Government, by George Didsbury, Government Printer"—would be presumed to be a public general law of New Zealand, printed by authority of the government, nor was such presumption overcome by a statement at the foot of the first page, "Supplement to the New Zealand Gazette, No. 57, of the 14th October, 1875."

EVIDENCE—FOREIGN LAWS—AUTHENTICATION.

22. Where a pamphlet, containing an alleged statute of a foreign country, appeared on its face to have been printed by the public printer, under governmental authority, and there was also evidence that the pamphlet had been procured by mail from D., whose name was imprinted thereon as government printer, the authenticity of the pamphlet was sufficiently proved to entitle it to be introduced in evidence.

EVIDENCE—FOREIGN LAWS—STATUTES—PART OF RECORD OR DOCUMENT.

23. Under Section 737, B. & C. Comp., authorizing the admission in evidence of a book purporting to contain the written law of a foreign

country, a pamphlet purporting to have been printed by authority of a foreign government, containing a complete statute with reference to the registration of births and deaths, followed by a complete index of contents, was not objectionable because it was not a book purporting to contain all the statutes of the country or a code of the country's laws.

EVIDENCE—"FOREIGN OFFICIAL DOCUMENT"—FOREIGN DEATH RECORD— CERTIFICATION.

24. A certified foreign death record, kept in accordance with the laws of the country in which the decedent died, is a "foreign official document" within Section 755, subd. 8, B. & C. Comp., providing that documents other than those previously referred to of a foreign country may be proved by the original, or by a copy certified by the legal keeper thereof, together with a certificate under the great seal of the country or sovereign thereof that the document is a valid and subsisting document of such country, and that the copy is duly certified by the officer having legal custody of the original; it being sufficient that the copy is certified to be a true copy of the entry of the death of the person named in the records of the officer.

EVIDENCE—RECORDS—CERTIFICATION—"DULY CERTIFIED."

25. The words "duly certified," used with reference to the certification of a copy of a foreign death record, should be construed to mean "certified according to law."

EVIDENCE—FOREIGN DEATH RECORD—CERTIFICATION—LAWS.

26. Under Section 755, subd. 8, B. & C. Comp., providing for the proof of foreign documents and records by the certification of a copy by the legal keeper of the record, with a certificate under the great seal of the country or sovereign thereof that it is a valid and subsisting document, and that the copy is duly certified, etc., the certification by the sovereign is to be made in accordance with the law of the place of the record.

EVIDENCE—FOREIGN RECORDS—CERTIFICATION—STATUTES.

27. Section 760, B. & C. Comp., providing that whenever a copy of a writing is certified to be used as evidence, the certificate shall state that the copy has been compared by the certifying officer with the original; that it is a correct transcript therefrom and of the whole or a specified part thereof—has no application to a certificate of a foreign death record offered on an issue of heirship.

EVIDENCE—FOREIGN RECORDS—CERTIFICATION.

28. Where the authentication by the governor of New Zealand to a copy of a death record of that country recited that the record of deaths from which the copy was taken was a record required and authorized by law, made at the time and prior to the death of the deceased, it constituted a substantial compliance with Section 755, subd. 8, B. & C. Comp., requiring such a certificate to certify that the document is a valid and subsisting document of the country from which it purports to come.

EVIDENCE—FOREIGN RECORDS—CERTIFICATION—SIGNING.

29. A foreign certificate to a copy of a death record recited in the body, "I, Edward John von Dadelszen," etc., but the subscription described him as "E. J. V. Dadelszen." The governor certified that this was the true and genuine signature of the person named in the body of the certificate. The certificate of the governor recited, "I, the undersigned William Lee, Baron Plunket," etc., and the subscription was merely "Plunket"; the words "Governor of the Dominion of New Zealand"

having been written thereunder by another. *Held,* that the record was properly certified.

EVIDENCE—OFFICIAL REGISTERS—SCOPE.

30. Records which come within the designation of official registers are competent evidence of the facts properly recorded therein, though they relate to matters not within the personal knowledge of the officer making them.

EVIDENCE—FOREIGN RECORDS—DEATH—PEDIGREE.

31. The law of New Zealand required the keeping of a public record of births and deaths, and required the relatives of the deceased present at the death, within 31 days, under a penalty for failure to do so, to inform the registrar of the name and age of the decedent; the names of her parents; the occupation of the father; where decedent was born; the length of time she was in the country; where she was married, and at what age; and the name of the registrar's informant who was required to sign the register, giving his occupation and place of residence. *Held,* that a certified copy of the record of a woman's death under such law, reciting that she died when 71 years of age; the names of her parents; that her father was a blacksmith; that she was born at Alva, Clackmannanshire, Scotland; that she had been in New Zealand 21 years, and at the age of 30 married L. at Glasgow; and that her son was the registrar's informant—was not limited to mere proof of the fact and time of her death, but was competent to prove all the facts certified.

EVIDENCE—RECORDS—OFFICIAL FACTS.

32. Where particular facts are inquired into and recorded for the benefit of the public according to law, the officers making the investigations and memorials are regarded as agents of all the individuals composing the state, and hence the facts recited in such records are admissible in evidence without being supported by oath.

EVIDENCE—PEDIGREE—REPUTATION.

33. On an issue as to the pedigree of a decedent, an alleged illegitimate son, a neighbor not related to decedent's alleged family, who knew both branches of his putative relations from long recollection, was competent to testify that it was common knowledge that F. was decedent's mother; Section 718, subd. 11, B. & C. Comp., permitting evidence of common reputation, existing previous to the controversy, in cases of pedigree.

EVIDENCE—PEDIGREE—REPUTATION—DEATH OF DECLARANT.

34. Where it was not shown that declarant was dead or without the State, as required by Section 700, B. & C. Comp., making declarations of a member of the family, who is deceased or out of the State, admissible as evidence of common reputation, where, on pedigree questions, such reputation is admissible, the admission of such declarations was reversible error.

From Union: JOHN W. KNOWLES, Judge.

Decided Aug. 17, 1909.

ON MOTION TO AFFIRM JUDGMENT.

[103 Pac. 512.]

*Mr. Charles E. Cochran,* for the motion.

*Mr. Charles H. Finn, contra.*

1. PER CURIAM. This is a motion to affirm a judgment, on the ground of the failure of the appellant to file a brief within the time limited by the rules of this court.

This cause was submitted at Pendleton, May 6, 1909, and transmitted to Salem for argument. The submission necessitates a casual examination, at least, of the errors assigned.

The briefs on the part of both parties have been filed, and, as the order of submission takes the case out of the operation of our rules, the motion should be denied, and it is so ordered.          MOTION DENIED.

---

Argued Oct. 6, decided Nov. 15, 1909.  Rehearing denied Jan. 18, further rehearing denied Feb. 15, 1910.

## ON THE MERITS.

[104 Pac. 967.]

Statement by MR. JUSTICE SLATER.

This is an escheat proceeding, brought in the circuit court of Union County, under the provisions of the act of February 19, 1903, (Laws 1903, p. 127) in the name of the State by F. S. Ivanhoe, district attorney of the Tenth Judicial District, against P. A. McDonald, as administrator of the estate of John Morrison, deceased.

The amended information was filed August 13, 1907, setting forth, in substance, that George E. Chamberlain, then Governor of the State, directed the district attorney to prepare and file the information in the name of the State; that John Morrison, late of Union County, was the last person lawfully seised of several tracts of land therein, describing them; that Morrison died intestate on January 31, 1905, leaving no heirs, children, widow, or known kindred capable of inheriting the same; that one portion of the lands was in the possession of P. A. McDonald, who, as administrator of the estate of John Morrison, is made a party to the proceeding, and another is

held by J. B. Friswold, who is also a party; that R. M. Rankin, T. M. Rankin, George Rankin, Earl Rankin, Minnie Goodman, Cora Joel, William Morrison, Lawrence Morrison, and Euphemia Krohn claim to be the owners of said real estate; that none of the defendants is entitled to said real estate, or to any interest therein, but that the same has escheated to the State, and the right of possession and ownership thereof is in the State; that John Morrison at the time of his death was also the owner of a large amount of personal property, consisting of horses, cattle, notes and accounts, aggregating in value $20,000; that on February 3, 1905, P. A. McDonald was appointed administrator by the county court of Union County, and that he thereafter qualified, took possession of all the assets and property of the estate, and administered upon the same in the usual course of business, collecting and converting into money all of the personal property, and paying all claims and demands against the estate, together with the costs and expenses of administration thereof, and that the estate, so far as the administration thereof is concerned, is finally and fully settled, and nothing remains to be done except to determine to whom, if any persons, the property of said deceased shall descend; that McDonald, on January 22, 1907, filed in the county court his final account, showing that he had on hand for distribution the sum of $15,663.62; that he, as administrator, had in his possession that amount of money for said estate; that John Morrison left no heirs, children, widow, or known kindred capable of inheriting the said money; that the parties above named claim to be the owners thereof, but that none of them is entitled to the same, or to any portion thereof; and that the whole thereof has escheated to the State.

Separate demurrers were interposed to the amended information; Minnie Goodman and Cora Joel joining in one, and all the other parties, excepting P. A. McDonald,

administrator, and John Friswold, joining in another, and the two latter in a third. All of the demurrers allege (1) want of jurisdiction of the persons and of the subject-matter; (2) several causes of suit improperly united; and (3) want of facts. In addition thereto the demurrer on the part of McDonald, administrator, and Friswold alleges want of jurisdiction of the court to try the question of heirship to the personalty. These demurrers having been overruled, the respective parties filed three separate answers, joining in the same relations in which they demurred. That of William Morrison, Lawrence Morrison, and Euphemia Krohn admits that at the time of the death of John Morrison he was the owner of the real property described in the information, and that they claim to own an undivided three-fourths interest therein, and that T. M. Rankin, Earl Rankin, Geo. Rankin, R. M. Rankin, Minnie Goodman, and Cora Joel are the owners of the remaining one-fourth, and that all of them are in the possession, and entitled to the possession, as heirs at law of John Morrison, deceased. Then the answer denies all other averments of the information. The separate answer of the last-named parties claiming to own the remaining one-fourth is to the same effect. P. A. McDonald answers separately, admitting the death of John Morrison, and the latter's ownership, at the time of his demise, of the property, substantially as alleged in the information, but denying that he (defendant) was in possession of any of the real property, admitting that he was appointed administrator of the estate, and that he had fully administered thereon, but denying that he had any money belonging to the estate in his possession, admitting that the other parties defendant, not including Friswold, claimed to be owners of the property as averred, and especially of the money remaining after the payment of the debts of the deceased and costs and expenses of the administration, and alleging that the

same was distributed and disbursed by the county clerk of Union County, upon an order of the county judge, to the said claimants. As an affirmative defense he avers all of the material facts relating to his appointment and qualification as administrator, and his acts in that capacity relating to the complete administration of the estate, including his discharge; that on the order of the county court he paid to the clerk all of the residue of said estate, and that thereafter that court adjudged and decreed that the above-named claimants were the heirs at law of the decedent, and that they were entitled to receive the same; that the clerk paid and distributed the same to such claimants by order of the county court, all of which it is averred occurred long before the commencement of these proceedings.

The reply denies the material averments of this answer, and affirmatively alleges that no notice of final settlement, based upon the final account filed January 22, 1907, was published in the manner prescribed by law, for any length of time in any newspaper in Union County, although there are, and were at that time, a number of newspapers published in that county, and of general circulation therein; and that any action of the county court, as set forth in the answer of P. A. McDonald, was and is void, because that court did not have jurisdiction to make an order directing the distribution of any of the proceeds of said estate, nor to adjudicate, settle, or confirm the matters and things contained in said purported final settlement.

Upon the defendants' request a jury was called to try the issues, and at the close of the State's case they moved for a nonsuit, which was denied, but before the cause was submitted, the State dismissed as to McDonald and Friswold. A general verdict in favor of the State was returned, upon which a judgment was entered escheating both the real and personal property, and declaring the

title thereto vested in the State, from which judgment the remaining defendants have appealed.        REVERSED.

For appellants there was a brief with oral arguments by *Mr. Turner Oliver* and *Mr. Charles H. Finn.*

For the State there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. Francis S. Ivanhoe,* District Attorney, and *Messrs. Cochran & Cochran,* with oral arguments by *Mr. Ivanhoe* and *Mr. Charles E. Cochran.*

MR. JUSTICE SLATER delivered the opinion of the court.

2. This is a special proceeding in which general power over the subject-matter is vested by statute in the circuit court. The manner of proceeding, and the facts necessary to be set forth in the information required to be filed, are specifically set forth in the statute, and they must be substantially complied with before there can be a valid adjudication. Wallahan v. Ingersoll, 117 Ill. 123 (7 N. E. 519). We think this has been done in this case, and that jurisdiction was acquired, at least so far as the real property is concerned. It will be observed that separate averments were made in the information respecting the title, ownership, and possession of the real property on the one hand, as distinguished from the personalty on the other. We presume this occurred because it was supposed that the possession was in different parties. We are not able to discover any other reason for such method of pleading; but, because of that circumstance, the claimants, or defendants, have challenged the pleading for misjoinder of two alleged separate causes of action—one to recover real, and the other to recover personal property in violation of Section 94, B. & C. Comp. That section, however, is one of the general rules of pleading, and has no application to this proceeding authorized by special statute. The act of February 19, 1903 (Laws 1903, p. 127), contemplates

the beginning of but one proceeding to establish by judicial procedure that all of the property of an estate has escheated, and it is not an action to recover the possession thereof. Section 4 of the act reads:

"At any time after the death of such person, and whenever the Governor is informed, or has reason to believe, that any such property (real, personal, or mixed) has escheated to the State, he shall direct the district attorney of the judicial district in which such property may be, to file an information"—setting forth the facts.

Upon the filing of such information process is to issue requiring all persons interested in the estate to appear and show cause, if any they have, why the title should not vest in the State. By section 7, at any time before the time for answering expires, all persons named in the information may appear and answer, and may traverse or deny the facts stated in the information, the title of the State to lands, tenements, and other property therein mentioned. So that it plainly appears from the provisions of the act that separate informations are not to be filed because different parties may have possession of several parts of the estate, or because the title to both personal and real property may be involved.

3. In some jurisdictions each traverse of the information constitutes a separate case (*in re* Malone's Estate, 21 S. C. 435-453) ; and, if the issues are so divergent as to require separate trials, it may be that a severance may rightfully be had by any of the defendants upon making proper and timely application therefor; but in this case, so far as the record discloses, all of the claimants, or defendants, proceeded to a joint trial without objection, and they are not now in a position to complain of that. This disposes of all of the objections raised by the several demurrers, excepting the special averment made by McDonald that the court had no jurisdiction to adjudicate the title as to the personalty.

4. The constitution of this State declares:

"The county court shall have the jurisdiction pertaining to probate courts, * * and such other powers and duties * * as may be prescribed by law." Article VII, Section 12.

Whatever is rightfully included in jurisdiction pertaining to probate matters is granted absolutely, and the legislature is powerless to take it away and transfer it to some other court. In determining what is jurisdiction pertaining to probate courts under the constitution, it is necessary to consider what jurisdiction probate courts had at the time the constitution was framed and adopted, as it is presumed the phrase "pertaining to probate courts" was used in that instrument in the sense in which it was accepted in Oregon at that time. *Adams* v. *Lewis*, 5 Sawy. 229 (1 Fed. Cas. 132). It can hardly be questioned that at and immediately prior to the adoption of that instrument, probate courts in the then territory of Oregon, upon final settlement of an estate, proceeded to distribute the residue of the personal property of the estate, if any, among the persons who were by law entitled (St. 1855, p. 375, § 9), and this necessarily involved a judicial determination of heirship, or who were entitled to the personalty.

5. Soon after the adoption of the constitution, the legislature made the jurisdiction of the county court exclusive over the distribution of the estates of intestates among the heirs or other persons entitled thereto. Section 911, subd. 4; Section 1220, B. & C. Comp. This continued to be the unquestioned state of the law respecting jurisdiction of county courts until the enactment of the statute of 1903 respecting proceedings in escheat cases, under which this proceeding was brought. By section 5 thereof:

"After an information to escheat an estate has been filed in a circuit court of the State, and a summons has been issued and served upon the person or occupant in possession of said estate, as required in this act, and

after making the order above provided for, the county court shall be ousted of jurisdiction to determine the question of heirship or right of claimants to said estate, except as to claims of creditors and its jurisdiction shall only continue for the purpose of determining the claims and demands of creditors, as hereinafter provided, and to collect debts and demands due the decedent at the time of his death and to otherwise settle and close the estate." Laws 1903, p. 128.

Here is an attempt to take from the county court a part of its previously well-recognized jurisdiction over the personalty of an estate, and to invest the same jurisdiction exclusively in the circuit court, and the question necessarily arises whether it is within the power of the legislature so to do. This question was mooted in the case of *State* v. *O'Day*, 41 Or. 495 (69 Pac. 542), but as this court then construed the escheat law, it did not undertake to interfere in any way with the jurisdiction of the county court in probate matters, and hence it was thought immaterial to consider whether the legislature could constitutionally deprive it of such jurisdiction. Discussing the state of the escheat law at that time, Mr. Justice BEAN, at page 503 of 41 Or. (page 545 of 69 Pac.), of the opinion, says: "It nowhere provides that the filing of an information in the circuit court to escheat personal property of the decedent will oust the county court of a previously acquired jurisdiction to settle the estate of the deceased, or vest in the circuit court the right to determine questions which by law belong exclusively to the county courts." This, however, has since been attempted by the act now under consideration.

6. The powers of a county court in this State, as to probate jurisdiction, are not created by statute (*Ramp* v. *McDaniel*, 12 Or. 108: 6 Pac. 456), but originate in the constitution, where jurisdiction pertaining to probate matters is granted absolutely.

"When courts derive their powers from the constitution of the state or nation, although in general terms

leaving it to the legislature to prescribe the form of procedure and rules governing them, if there be no restriction on the powers so conferred, the legislature may by statute enlarge them, and establish other courts of concurrent jurisdiction with the one created by the fundamental law, provided the constitutional powers of the latter are not molested or interfered with." Brown, Jurisdiction (2 ed.), § 13.

While it may be that jurisdiction conferred by the constitution upon county courts over matters pertaining to probate courts is not an exclusive jurisdiction, yet it is quite certain that such jurisdiction is conferred, and that it includes the distribution of the personalty among the heirs or other persons entitled thereto. We are of the opinion, therefore, that the legislature does not possess the power to deprive the county court of its primary and fundamental jurisdiction to determine the heirship as to personalty and make distribution of the estate of a decedent, and its attempt to do so is unconstitutional. For this reason, under the facts of this case, the judgment, so far as it affects the title to the personalty of this estate, is void.

The information to which the demurrer of P. A. McDonald was directed alleges his appointment and qualification as administrator; that he took possession of the property of the estate; converted it into money; has fully administered upon the estate; has filed his final account; and has a residue of $15,663.62 in his hands. But it also alleges that the other defendants here are claiming to own the same. It must be assumed, as appears to be the fact, that they made their claims in the county court in the usual course of administration of this estate, and hence that court had acquired jurisdiction of the subject-matter of the personalty, and of the parties claiming the same, prior to the filing of the information in the circuit court; and it has the exclusive power, if it has not done so in a legal manner, to adjudi-

cate the validity of their claim. Not until the probate
court has completed the administration, and adjudged
that there is no lawful claimant, can the circuit court
assume jurisdiction over the personalty. This, however,
does not affect the jurisdiction of the circuit court to
adjudicate upon the devolution of the title to realty,
which the action of the county court cannot effect. *State
v. O'Day,* 41 Or. 495 (69 Pac. 542). Because the State
dismissed the case as to McDonald before it was sub-
mitted to the jury, it might be said that this question is
not here, but nevertheless a judgment was entered
escheating the personalty, and for that reason the same
question is here, although raised in a different form by
other defendants, and we have taken the first and most
convenient opportunity to express our views upon the
question of jurisdiction of that branch of the case.

7. Before considering any other assignments of error
it will be necessary to determine the nature of such pro-
ceedings, as to whether they are at law or in equity. If
the former, we will be confined to an inspection of the
bill of exceptions, but if the latter, the whole of the
evidence must be considered and the case tried *de novo.*
In an action against the State to recover property that
had been escheated, this court held that such proceedings
is at law (*Fenstermacher* v. *State,* 19 Or. 504, 507: 25
Pac. 142), because the subject-matter to be tried is to
identify the petitioners as heirs of the intestate, and
entitle them to recover the money escheated. This ruling
was followed in *Young* v. *State,* 36 Or. 417, 424 (59 Pac.
812: 60 Pac. 711: 47 L. R. A. 548), which is a case of
the same character. The present case is to escheat the
real property of an intestate, but the inquiry is practically
the same; that is, to determine whether there are any
heirs, and particularly whether the defendants are the
heirs. The case of *State* v. *Simmons,* 46 Or. 159 (79
Pac. 498), was brought to escheat the property of an

intestate. It was tried by the court without a jury.
Findings of fact and of law were made and judgment
rendered thereon. The case came to this court on the
claim that the findings were not sufficient to support the
judgment. The question now under consideration was
not suggested, but the court treated the case as an action
at law, and refused to modify the judgment to accord
with what was claimed to be the facts. Section 7 of the
act (Laws 1903, p. 129), gives the right to a trial by jury,
if requested by either party, and makes the verdict ren-
dered conclusive upon the court. This, we think, estab-
lishes the character of the proceeding to be an action at
law.

8. Error is claimed because of the refusal of the trial
court to suppress the depositions of John Ritchie and
Mrs. Margaret Shaw, because of certain alleged irregu-
larities occurring at the taking of them. The determina-
tion of the trial court was necessarily based upon ques-
tions of fact evidenced by affidavits in support of the
motions, and counter affidavits. Unless the evidence upon
which it acted has in some way been made a matter of
record, as by bill of exceptions, this court cannot con-
sider the errors assigned. *Farrell* v. *Oregon Gold Co.*,
31 Or. 463 (49 Pac. 876) ; *Sutton* v. *Clarke,* 42 Or. 525
(71 Pac. 794) ; *State* v. *Kline,* 50 Or. 427, 430 (93 Pac.
237) ; *Harvey* v. *Sinker,* 35 Ind. 341. The motions and
affidavits do not appear in the record, and therefore the
questions presented will not be considered.

9. An exception was taken to the reading of the
depositions of Mrs. Margaret Shaw because it was claimed
the evidence submitted did not show that she was too
infirm to attend at the trial. The testimony on the part
of the State, from one in a position to know the facts,
is that she was somewhat infirm in body, being about 70
years of age, and was afflicted with chronic ailments,
which would render it unsafe to her life to attend. There

is some testimony of an opposite character; but it is based on casual observation, and not on a scientific and professional examination of the witness. No fixed rule, however, can be laid down by which a court can regulate itself on these occasions. Their determination must often depend on the particular circumstances of the case, and the whole matter must necessarily be left to the sound discretion of the trial court. *Parks* v. *Dunkle,* 3 Watts & S. (Pa.) 291. We are unable clearly to see that the court below ought to have rejected the deposition, and there was no error in receiving it.

10. We come now to the consideration of the most important question of the case—that is, the competency and materiality of the testimony. Before doing so, it would perhaps be well to state the attitude of the parties. It was admitted by both parties that the intestate was born in the town of Alva, Clackmannanshire, Scotland, and that James Morrison was his father. The controversy is as to who was his mother. On the part of the State it was attempted to be shown that he was the illegitimate son of James Morrison and Catherine France, who never inter-married, and that the latter died before the intestate, who left no direct heirs, while on the part of the defendants it was attempted to be shown that he was the son of James Morrison and Jeannette Marshall, who, after the birth of her illegitimate son, intermarried with James Morrison in about the year 1837, at Alva, Scotland, thereby, as claimed by the defendants, to all intents and purposes legitimatizing the issue by virtue of our statute (Section 5581, B. & C. Comp.) ; that the defendants, Euphemia Krohn, William Morrison, and Lawrence Morrison, and Jeannette Morrison, who afterwards married William Rankin, but is now deceased, and is represented here by her children, are the sons and daughters of the said James and Jeannette Morrison, born in lawful wedlock, brothers and sisters of the whole blood to the intestate, and therefore his lawful heirs.

Objection was made to the testimony of Mrs. Shaw as to its competency and materiality, for the reason that there was undertaken to be shown by her the pedigree of the intestate, John Morrison, without first having shown that the witness was *de jure* related to John Morrison. If she were offered as a witness to give evidence of the declarations of a deceased person out of the State, who is related to a family, as to the pedigree of some other person with relation to that family, before such declarations could be admitted, the relationship of the declarant to the family must be shown by other evidence than the assertions of the declarant. *Thompson* v. *Woolf*, 8 Or. 454; *Young* v. *State*, 36 Or. 417 (59 Pac. 812: 60 Pac. 711: 47 L. R. A. 548).

11. The substances of Mrs. Shaw's testimony is that she was born in Alva, Scotland, on April 21, 1837; that the place where she lived was called Green Square; that she was acquainted with John Morrison, the intestate, and had known him from childhood; that he lived at her mother's house in Alva until he left for America when he was sixteen or seventeen years of age; that her mother raised him from birth to boyhood, and until he left, furnished him with clothing, medicine, and the usual family cares; that Catherine France was his mother; that she was personally acquainted with Miss France, who was one of the close neighbors, and lived across the street; that after the birth of John Morrison, she came to the home of witness' mother several times; that she heard Miss France on occasions speak to the child, John Morrison, and call him "her boy," and he called her his "ma," and would say "that's ma come to see me"; that witness' mother remarked that "That," referring to Catherine France, "was John's mother coming to see him." There is in the record, however, other evidence to the effect that the mother of Mrs. Shaw was Ann Morrison, a sister of James Morrison, the reputed father of

the intestate.   The declarations under consideration are
not those of Mrs. Shaw, and hence their competency does
not depend upon her relationship to the intestate, but
upon that of the declarants.   She appears as the witness,
and speaks from personal knowledge of the declarations
of the three persons named, and it is to them our atten-
tion must be directed.

12. The declarations or acts of the intestate tending
to show his own illegitimacy are admissible as against
those claiming under him.   1 Taylor, Ev. (8 ed.) § 637;
Abbott's Trial Ev. 89; Wharton's Ev. § 203.

13. And likewise the declaration or act of the putative
mother to the same purport is admissible, because she
speaks from her own knowledge, and not from hearsay.

14. It is shown by competent testimony that Ann Mor-
rison, with whom intestate lived until he was sixteen or
seventeen years old, is a sister of James Morrison, the
admitted father of the intestate.   It is true her relation-
ship to the intestate is not *de jure*, but *de facto*, but there
is a *de jure* relationship between her and the putative
father, and coupled with that is the fact that the intestate
was in fact a member of her family from his birth to
early manhood.   While under some authorities the dec-
larations of one so related, without any other fact of
personal association being added, might be inadmissible,
still with this latter fact shown, we think, for the reasons
hereinafter stated in another connection, that not only
are the declarations of Ann Morrison as to the parentage
of John Morrison competent, but also the direct evidence
of Mrs. Shaw to the same point.

15. There was offered and received, over the objections
of the defendants as to the competency and materiality
thereof, oral and written admissions made by William
Morrison, one of the defendants, to the effect that the
intestate was his illegitimate half-brother; that the lat-
ter's mother was a woman in Scotland whom he never

knew. These admissions were made at the City of La Grande, Oregon, a short time before the origin of this controversy, and it seems, furnished the first clue to the claim now made by the State. It appears from the testimony offered and received that the defendants, in a friendly suit between them, had secured a decree in the circuit court of Union County partitioning these lands among them, and ordering a sale thereof; that a sale had been had, but the purchaser, desiring to be assured of a good title before making payment, employed an attorney to examine the record. The latter advised his client that it would be necessary to have some proof of the relationship of the defendants to the intestate on which their claim of heirship and title was based. Wm. Morrison came forward to furnish the desired information, and disclosed the facts offered in evidence. The objection is upon the ground that it was not shown that the declarant, Wm. Morrison, was *de jure* related to the intestate, and that such proof was necessary to render the declarations admissible. This would seem to involve an absurdity, for he claims a share of the estate because he is a full brother of the intestate, but the State disputes this assertion, and it is contended by the defendants that, before his declarations as to the pedigree can be received, the State must prove the defendants' case. The declarations were certainly competent against the declarant himself as admissions against his interest, and this seems to have been impliedly conceded; for, after having been received as against all the parties, a special instruction was requested by the other defendants, limiting the effect thereof to to defendant, Wm. Morrison. This, however, was denied.

16. It is possible that this testimony might be competent against all of the defendants, as argued by counsel for the State, on the ground of admissions against their interest; that they were engaged in a common scheme to acquire title to this property, and when Wm. Morrison

made these declarations he was acting in their interest and as their agent, but we are of the opinion that they are admissible upon the general principle of the declarations of a member of a family as to pedigree, and we prefer to put it upon that ground. The declaration, act, or admission of a member of a family as to pedigree, and we prefer to put it upon that ground. The declaration, act, or admission of a member of a family who is deceased, or out of the State, is admissible as evidence of common reputation in cases where, on questions of pedigree, such reputation is admissible. Section 700, B. & C. Comp.

17. It is an admitted fact in this case that at the time of the trial, the declarant, William Morrison, was in the State of Ohio, where he resided. The blood relation usually thought of in connection with the rule is that between the declarant and the person whose pedigree is in question, yet this is not always essential. "So, it seems," says Mr. Elliott in his work on Evidence, at volume 1, p. 479, "that it is sufficient if the declarant is related to the family with which the person in question seeks to connect himself." The rigid adherence to the rule that the declarant must be a member of the family of the person whose pedigree is in question, and that the relationship must be *de jure,* has led to the ruling that where the two were only related through the reputed father, the declaration was not competent. This principle was enunciated in *Crispin* v. *Doglioni,* 3 Sw. & Tr. 44, decided in 1863, and in *Bamford* v. *Barton,* 2 Moo. & R. 28, and in this country in *Northrop* v. *Hale,* 76 Me. 306 (49 Am. Rep. 615) ; *Flora* v. *Anderson* (C. C.), 75 Fed. 217, 234. But it seems the principle has been disapproved in England in *Murray* v. *Milner,* L. R. 12 Ch. D. 849. In *Barnum* v. *Barnum,* 42 Md. 251, 304, the declarations of the mother of R. as to the nonmarriage of R. and C. and the illegitimacy of their child, J., were admitted; and in Heaton's Estate, 135 Cal. 385 (67 Pac. 321), when

there was a claim of inheritance as the illegitimate child of H., the declarations of H., in whose family the claimant lived, were admissible under a statute identical with the statute of this State above quoted. It is stated in 2 Wigmore, Ev., at § 1492, that:

"It has been ruled in England that where the relationship claimed and to be testified to is that of an illegitimate child, the father's relations are not qualified declarants, because (apparently) the claimant is legally not of the declarant's family. But this seems a mere juggling with legal rules. The question is, Was the declarant in such a position as to be likely to know something of this alleged fact of family history? Whether the illegitimate child is or is not a lawful heir, according to the rules of the substantive law about succession, is quite beside the point in determining the evidential question of the declarant's probable information. The principle of the ruling has been disapproved in England, and ought not to be followed in this country. It seems never to have been doubted that the declarations of the parents themselves, or the repute in the household where the child lived, as to a child's legitimacy or illegitimacy are receivable, although it is obvious that upon the false theory of *Crispin* v. *Doglioni* the father's declarations of illegitimacy would be inadmissible. There is a danger of being too nice in the logical application of the substantive law of relationship to the present testimonial rule, which rests rather upon the moral probabilities of truthworthiness in the declarant."

The record in this case shows that the intestate not only resided in the family of Ann Morrison at Alva, Scotland, until he was sixteen or seventeen years old, but also that after he came to this country, he resided for a number of years in the family of his father, James Morrison. Now, if the evidence of one of the defendants, Mrs. Krohn, who is a legitimate child of James and Jeannette Morrison, is admissible to establish the parentage of John Morrison, and to give the acts and declarations of Mrs. Jeannette Marshall Morrison towards the intestate while he was a member of her family, from

which the inference might be drawn that she acknowledged him to be her son, and if the declarations of James Morrison, the father, in his letters to the intestate, addressing him as his son, which *prima facie* would mean his legitimate son, are also admissible, then we see no valid reason against the admissibility of the declarations or admissions of another member of the same family claiming to bear the same relationship to the intestate, but tending to negative the claim of legitimacy. There is no reason, at least in such near putative relationships, why the negative of the fact of relationship, or the degree of relationship, should not be as much a part of the family history as the affirmative of such proposition. Gillett, Indirect and Collateral Evidence, 196. We conclude that there was no error in receiving the testimony.

18. We are unable, however, to find any principle of law upon which to base the admission of that part of the evidence of John Ritchie, where he deposed that Catherine France was the mother of the intestate. It is not shown, nor is it claimed, that he bears any relationship to either branch of the intestate's family, but he stands in the attitude of a neighbor, having known from his earliest recollection both families of the intestate's putative relations. He assumes, however, to speak from common knowledge of the neighborhood. Common reputation, or what the neighbors thought or said upon the subject of the parentage of the person whose pedigree is in dispute, is not admissible. *Johnson* v. *Lawson*, 2 Bing. 86; *De Haven* v. *De Haven*, 77 Ind. 236 (22 Am. & Eng. Enc. Law [2 ed.] 650).

19. The testimony of witnesses who are not connected with the family, know nothing personally of the facts of which they speak, and have not derived their information from such persons as had connection with the family, but can state only loose hearsay from unknown sources, is not sufficient to go to the jury. Abbott's Trial

Ev., 94. To render the evidence competent it must appear that the declarant, or source of the witness' information, was a member of the family, or related to the family, whose history the fact concerns, and was deceased or out of the State. The witness must name the source of his information, and show affirmatively that it was a relative or connection. Abbott, Trial Ev., 91.

20. Ritchie says he never heard the members of Catherine France's family refer to the relationship of John Morrison to her, but that he knew that the Frances were displeased at the birth of the child (but he does not say how he knew), and that after the child was handed over to the Morrisons the family of Miss France did not, so far as witness remembers, acknowledge him in any way. We are of the opinion that this is not sufficient to render his evidence competent on the particular matter mentioned, but as to the remainder of his testimony we think that it was proper to receive it because he testified from personal knowledge. For the same reason, the testimony of declarations, said to have been made by P. A. McDonald, to the effect that there was an existing tradition in the Morrison family as to the relationship of the intestate to the family, was not admissible.

21. There was competent evidence that Catherine France, some years after the birth of the intestate, married a man by the name of Lockhart, at Alva, Scotland, and afterwards removed with her husband to the province or dominion of New Zealand. There was then offered by the State, and received over the objection of the defendants as to its competency, 13 printed pages, bound or tied together by a linen thread in book or pamphlet form, as a complete statute of the dominion of New Zealand relating to the registration of births and deaths in that dominion. The purpose of the offer was to lay a basis for the introduction of a copy of the register of

deaths, showing the fact and date of the death of one Catherine Lockhart, and other facts there recorded relating to such decedent. The substance of the objection is that (1) it does not purport to be an authorized official publication, but on the contrary, appears to be a private publication; and (2) that it is not a book purporting to contain the stautes or code of laws of that dominion within the meaning of Section 737, B. & C. Comp., and is but a fragment of the law. There is no merit in either of these contentions. There appears printed upon the last page, at the conclusion of the subject-matter of the statute, the words "Wellington, New Zealand; Printed under the authority of the New Zealand Government, by George Didsbury, Government Printer." This creates a *prima facie* presumption that it was printed and published by public authority. Section 788, subd. 36, B. & C. Comp. This, we think, is not overcome by the following, which is printed at the foot of the first page: "Supplement to the New Zealand Gazette, No. 57, of the 14th of October, 1875"—because that paper may have been, and probably was, an official publication, and that language does not negative the *prima facie* case that the document was printed or published by the public printer, as it purports to have been.

22. Then, too, the evidence shows that the print offered was in fact procured by mail from George Didsbury, whose name is imprinted thereon as government printer, and that would seem to remove any doubt on that question. This authentication is sufficient under the statute to entitle the pamphlet to be received in evidence. *State* v. *Savage,* 36 Or. 191, 213, 214 (60 Pac. 610: 61 Pac. 1128).

23. Upon the other objection that the instrument offered is not a book within the meaning of Section 737, B. & C. Comp., but is a fragment of the law, we find direct authority in that section for the admission of the document, if it purports upon its face to be in fact a

complete law, for that section authorizes the admission
as evidence of a book purporting to contain not only
"the statutes or code," but also "other written law," of a
foreign country. The first page of the pamphlet has
printed upon it the name of the country, the coat or arms
of Great Britain, the year of the reign of Queen Victoria
in which the act was passed, and a complete analysis or
index of the contents. The following pages purport to
contain the full text of an act of that dominion, giving
the full title thereof, passed October 12, 1875, and con-
taining 51 sections, with schedules of forms attached for
the use of the registrar. When we consider that it has
become an established custom of all modern govern-
ments to cause to be published under public authority, in
pamphlet or book form, special departments of the law,
such as school laws, road laws, election laws, etc., for
the use and special information of the public generally,
we see no reason why a court should hesitate to receive
this document as evidence of a complete law upon the
particular subject covered by the title of the act.

24. Objection was made to the admission in evidence
of a copy of the entries on the registration record because
(1) it was not certified as required by our statute; and
(2) was not authenticated as required by our statute;
and (3) because the statements therein concerning the
pedigree of Catherine Lockhart are hearsay, and that
the document is incompetent to prove the same. The
material part of the appended certificate is "that the
above is a true copy of the entry of the death of Catherine
Lockhart in the records of my office." It is contended
that this form does not meet the requirements of section
760 of the statute, which is that "Whenever a copy of a
writing is certified to be used as evidence, the certificate
shall state that the copy has been compared by the cer-
tifying officer with the original, and that it is a correct
transcript therefrom, and of the whole of such original,

or of a specified part thereof." The record of which proof is sought to be made is a foreign official document of the class described in Section 755, subd. 8, B. & C. Comp. (Greenleaf, Ev., § 470; Jones, Ev. [2 ed.], § 500; 9 Am. & Eng. Enc. Law [2 ed.] 880), and proof may be made thereof by "a copy certified by the legal keeper thereof, together with a certificate under the great or principal seal of the country or sovereign thereof, that the document is a valid and subsisting document of such country, and that the copy is duly certified by the officer having the legal custody of the original." Section 755, subd. 8, B. & C. Comp.

25. The words "duly certified," used therein, must mean "certified according to law."

26. The judgment of a foreign sovereign as to the legality of the act of one of his subordinate officers who has the legal custody of the original being required to be stated, it cannot be presumed that his judgment is to be measured by any other law than that of the place of record. That is, it is the intent of the statute that the officer having the legal custody should make his certificate according to the law of the place of record.

27. Section 760, B. & C. Comp., has no application to the certificate of a foreign record of the character of the one offered in evidence.

28. The objection to the sufficiency of the authentication by the sovereign is that his certificate does not expressly declare in the words of the statute "that the document is a valid and subsisting document of such country." But it does declare "that the record of deaths, from which the copy is taken was a record required and authorized by law to be made at the time and prior to the death of the deceased." This is a substantial compliance with the statute, and we think is sufficient.

29. Some criticism has been indulged in by defendants' counsel directed to the abbreviated character of the sig-

natures of the certifying officers. For instance, in the body of the certificate of the registrar-general is the recital "I, Edward John von Dadelszen," etc., but the subscription is "E. J. V. Dadelszen." It is certified, however, by the sovereign, or governor, that it is the true and genuine signature of the person named in the body of the certificate. Again, the certificate of the governor recites, "I, the undersigned William Lee, Baron Plunket," but the subscription is merely "Plunket"; the words "Governor of the Dominion of New Zealand" having been written thereunder by another. We take this to be his official name, and the form in which all official documents are signed by that dignitary, and we hold it to be sufficient where the document bears the great seal of the country, as this does. It is claimed that the certificate shows that the name "Plunket" was written by another and inferior officer at his excellency's command; but counsel are evidently in error, for the words "By his Excellency's Command, John G. Friedlay, Minister of Internal Affairs," appearing upon the certificate underneath the impression of the great seal, refer to the affixing of the seal, and not to the signing of the sovereign's name.

30. The last objection made to the admission of the document goes to the extent to which it may be used as evidence; it being contended that it is limited to proof of the fact and time of the death of the person named therein, while the instrument offered purports to show that Catherine Lockhart was seventy-one years old; that her parents were Robert and Helen France; the former's occupation that of blacksmith; that decedent was born at Alva, Clackmannanshire, Scotland, and that she had been in New Zealand 21 years; that at the age of 30 she was married to William Lockhart at Glasgow, Scotland, and that James Lockhart, her son, was the registrar's informant, and that he signed the register giving his occupation and place of residence. It is not claimed that these

recitals, if competent, are not material, for they serve to identify the decedent with the Catherine France mentioned and described in the deposition of Ritchie and Mrs. Shaw, but it is claimed that they are hearsay, and not competent. A registry, whether of birth, marriage, death, or burial, kept pursuant to law, is competent evidence of the main fact and its date, and of any other fact which the law or statute directed the officer to ascertain and record; and it is not incompetent because the statute does not expressly declare it to be evidence. But a register kept without authority of law is competent evidence of the main fact only, and not of other facts stated in it, such as date or place of birth. Abbott's Trial Evidence, §§ 43-44. Records which come within the designation of "official registers" are competent evidence of facts properly recorded therein, although they relate to matters not within the personal knowledge of the officer making them. 10 Enc. Ev., 716; Greenleaf, Ev. (15 ed.), § 493; *Worcester* v. *Northborough*, 140 Mass. 397 (5 N. E. 270) ; *Murray* v. *Supreme Lodge*, 74 Conn. 715 (52 Atl. 722).

31. An inspection of the law of New Zealand relating to the registration of births and deaths in that dominion, due proof of which was made, discloses that the register in question was required to be kept as a public record, at all times to be open to inspection by the public; that all of the facts noted above were required to be entered therein by the registrar, who is a public official; that upon the death of any person it was the duty of the relatives of the deceased present at such death, within 31 days, under a penalty imposed for failing to do so, to inform the registrar of the particulars required to be registered concerning such death, and to attend at the registrar's office and sign the register, and when, after entry, any error of fact or substance shall have been discovered by any person, he may, within three months

of the time of discovery, require the error to be corrected by producing to the registrar his solemn declaration of the truth, accompanied by two witnesses, who shall sign the register when corrected. From the copy offered it appears that Catherine Lockhart died May, 29th, and on June 4, 1879, James Lockhart, her son, appeared before the registrar, and furnished to that officer the information entered therein, and signed the register. The facts recorded, while not within the knowledge of the officer, have been ascertained and entered by an authorized and accredited public agent appointed for the purpose, and for the benefit of the public.

32. When the particular facts are inquired into and recorded for the benefit of the public, those who are empowered to act in making such investigations and memorials are in fact the agents of all the individuals who compose the State; and every member of the community may be supposed to be privy to the investigation, and for these reasons it is not necessary that they should be confirmed and sanctioned by the ordinary tests of an oath to entitle them to be received as evidence. 1 Greenleaf, Ev. (15 ed.), § 483. There was no error in receiving the evidence.

Because of the erroneous admission of that part of the deposition of Ritchie touching the relationship of Catherine France to the intestate, and the similar unsworn statements of P. A. McDonald, the judgment is reversed, and the cause remanded for a new trial.          REVERSED.

---

Rehearing denied January 18, further rehearing denied February 15, 1910.

ON PETITION FOR REHEARING.

[106 Pac. 444.]

33. Both parties have petitioned for a rehearing. Plaintiff has questioned the correctness of the ruling made on

the admissibility of that part of the deposition of John Ritchie touching the relationship of John Morrison to Catherine France. The question propounded to the witness was:

"State what relationship existed between Catherine France and John Morrison, if any, and, if you say they are related, state fully the character of that relationship, and how you know the same."

At the submission, by plaintiff, of interrogatories, defendants' counsel interposed written objections, to the effect that the question was incompetent, irrelevant, and immaterial, and that the witness was not shown to be competent, on the theory that before he could testify it must be shown that he was related to decedent. These objections were renewed at the trial, but were overruled. Afterwards defendants moved to strike out the answer for the same reasons previously assigned, and also because it was not responsive to the question. The response of the witness was:

"John Morrison was Catherine France's son. I lived in Green Square, where the Morrison's lived, and it was common knowledge that John Morrison was the son of Catherine France."

The court struck out that part of the answer beginning with "it was common knowledge," etc. The defendant excepted to the refusal of the court to strike out all the answer. We held that the answer indicated the witness was testifying, not from personal knowledge, but from common reputation of the neighborhood, and, for that reason, was not competent. In this we were in error. Common reputation, existing previous to the controversy, is made competent by the statute as evidence of pedigree. Section 718, subd. 11, B. & C. Comp. The whole of the answer in question was admissible for the purpose for which it was offered, and it was error to reject a part of it.

Sig. 15

34. We have carefully reviewed the record upon the other question raised by plaintiff's motion, viz., that there was sufficient evidence to establish a relationship of McDonald to the Morrison family, by proof of his marriage to a granddaughter of James Morrison. It is claimed that the establishment of this relationship renders competent his declarations as to a tradition having existed in the family, that John Morrison was the illegitimate son of James Morrison. But we are satisfied that the evidence alluded to in the motion falls short of identifying McDonald's wife with the Morrison family. Moreover, if it did, still, to render his declarations competent it must also be shown either that declarant was dead, or was absent from the State at the time of the trial (Section 700, B. & C. Comp.), neither of which was shown. This constitutes reversible error, and therefore plaintiff's motion must be denied; but the motion heretofore rendered will be modified in respect to the admissibility of Ritchie's evidence, and made to conform to what is now stated upon that question.

The defendant's motion has also been carefully reviewed by us; but, not finding anything therein not previously considered by us, it will also be denied.

MODIFIED: REVERSED: REHEARING DENIED.